# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                     No. CR. 17-2556 JB

LEOTHA WILLIAMS,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendant Leotha Williams' First Set of Objections to the Presentence Report, filed March 16, 2020 (Doc. 198)("First Objections"); and (ii) Defendant Leotha Williams' Second Set of Objections to the Presentence Report, filed March 16, 2020 (Doc. 199)("Second Objections"). The primary issues are: (i) whether the Court should amend the Presentence Investigation Report ¶ 11, at 8, filed January 6, 2020 (Doc. 184)("PSR"), to omit its characterization of Defendant Leotha Williams' co-Defendant, Adonis Baker, as the most active sex trafficker in Albuquerque, New Mexico; (ii) whether the Court should amend the PSR's ¶ 14, at 9, to omit its statement that Baker placed advertisements for trafficked women in Texas, Arizona, Nevada, Illinois, Tennessee, Alabama, Missouri, Kansas, and Virginia; (iii) whether the Court should amend the PSR's ¶ 14, at 9, to omit its reference to Baker's use of a firearm in forcing Jane Doe 2, Williams' victim, to get into a car with Baker and Williams; (iv) whether the Court should amend the PSR's ¶ 17, at 9, to omit its description of Baker's abuse of Jane Doe; (v) whether the Court should amend the PSR's ¶ 18, at 9, to omit its characterization that girls and women in Williams and his co-Defendants' employment were not free to leave such that Jane Doe 2 had to escape from Williams and his co-Defendants; (vi) whether the Court should

amend the PSR ¶ 23, at 10, to omit its characterization that Williams conspired and engaged in an extensive human trafficking organization; (vii) whether the Court can rely on Baker's sale of Jane Doe 7, a sex worker, to Cornelius Galloway in March, 2016, as conduct relevant to Williams' sentence; (viii) whether the Court should amend the PSR's ¶ 46, at 13, to omit instances of Baker's sexual abuse of his victims, because there is no evidence that Williams was aware of this abuse; (ix) whether the Court should amend the PSR's ¶ 47, at 13, because there is insufficient evidence that Baker held one of victim's children hostage to intimidate the victim to continue working for Baker; (x) whether the Court should amend the PSR's ¶ 50, at 14, because there is insufficient evidence that Baker and Williams took several victims to Colorado Springs, Colorado, to engage in sex work; (xi) whether the Court should apply the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or "Guidelines") § 2G1.1, rather than U.S.S.G. § 2A3.1, to Williams' offense, because Williams did not coerce or intimidate the sex workers that Baker employed, but rather persuaded them to continue working; (xii) if U.S.S.G. § 2A3.1 applies, whether Williams abducted Jane Doe 2 such that a 4-level enhancement for abduction under U.S.S.G. §2A3.1(b)(5) applies; (xiii) whether Williams' offense involved physical restraint of Jane Doe 2 such that U.S.S.G. § 3A1.3's 2-level enhancement applies; and (xiv) whether Williams' role was sufficiently minimal that he should receive a 4-level adjustment pursuant to U.S.S.G. § 3B1.2(a).  Williams' primary argument for several of these objections is that he was unaware of and not present for much of Baker's abuse.  See First Objections at 2-5.  The Court concludes that many -- but not all -- of Baker's acts to whose inclusion in the PSR Williams objects are foreseeably within the scope and in furtherance of Williams' jointly undertaken criminal activity. See U.S.S.G. § 1B1.3.  Accordingly, the Court concludes that: (i) Plaintiff United States of

America has not proven by a preponderance of the evidence that Baker was Albuquerque's most active sex trafficker, so the Court will amend the PSR's ¶ 11, at 8, to omit that characterization, unless the United States presents evidence at the sentencing hearing that supports the PSR's characterization of Baker; (ii) although Baker placed sex-worker advertisements in other states, advertisements beyond New Mexico and Colorado were not within the scope of jointly undertaken conduct in which Williams agreed to assist, and so the Court will amend the PSR's ¶ 14, at 9; (iii) Baker's use of a firearm in directing Jane Doe 2 to get into a vehicle with Baker and Williams was foreseeably in furtherance and in the scope of jointly undertaken criminal activity, so the Court will not amend the PSR's ¶ 14, at 9; (iv) the relevance of Baker's abuse does not depend on Williams' knowledge, because that abuse was central to Williams and his co-Defendants' criminal enterprise, so the Court will not amend the PSR's ¶ 17, at 9; (v) the United States has proven by a preponderance of the evidence that sex workers in Williams' employ were not free to quit or leave, so the Court will not amend the PSR's ¶ 18, at 10; (vi) the United States has not proven by a preponderance of the evidence that Williams conspired and engaged in an extensive trafficking organization, so the Court will not amend the PSR's ¶ 23, at 10; (vii) that Baker sold Jane Doe 7 to another trafficker is illustrative of Williams' offense and so is relevant under 18 U.S.C. § 3661; (viii) Baker's sexual abuse of sex workers in the Defendants' employ is relevant to Williams' offense under 18 U.S.C. § 3661,  so the Court will not amend the PSR's ¶ 46, at 12; (ix) there is sufficient evidence that Baker held one of his victim's children hostage to coerce the victim's subservience, and this incident is relevant under 18 U.S.C. § 3661, so the Court will not amend the PSR's ¶ 50, at 14; (x) there is sufficient evidence that Baker took several victims to Colorado Springs to engage in sex work, and this conduct is relevant to Williams' offense under 18 U.S.C.

§ 3661, so the Court will not amend the PSR's ¶ 50, at 14; (xi) U.S.S.G. § 2A3.1 properly applies to Williams' offense, because, although he pled guilty to violating 18 U.S.C. § 2422(a), his offense conduct involved coercive behavior that § 2A3.1 cross references; (xii) § 2A3.1(b)(5)'s 4-level enhancement applies, because Williams aided and abetted Baker when he forcibly abducted Jane Doe 2, transported her to another state, and forced Jane Doe 2 to engage in sex work; (xiii) Baker forcibly restrained Jane Doe 2, and Williams aided and abetted that restraint, such that § 3A1.3's 2-level enhancement applies; and (xiv) Williams' role in the sex-trafficking enterprise was not supervisory or managerial, but also was not minimal, so a 2-level reduction in Williams' offense level is appropriate.  The Court also concludes that the PSR's application of a 4-level enhancement under §2A3.1(b)(1) is proper and does not constitute double counting, but that the PSR improperly applies a 2-level enhancement under § 2A3.1(b)(4), because Williams' victim did not sustain serious bodily injury.  Accordingly, the Court sustains in part and overrules in part the First Objections, and sustains in part and overrules in part the Second Objections.

## FACTUAL BACKGROUND

The Court takes its facts from the PSR and the Plea Agreement, filed October 15, 2019 (Doc. 173).  Between 2014 and 2017, Baker led a sex trafficking organization in which co-defendant Inkosi Grandberry and Williams assisted.  See PSR ¶ 23, at 10.  Grandberry and Williams served as Baker's lieutenants, assisting Baker in capturing women and ensuring their continued subservience.  See PSR ¶ 23, at 10.  Baker typically targeted homeless or drug-addicted girls and women whom he lured into his control by offering drugs and shelter, and whom he then forced into sex work.  See PSR ¶ 23, at 10.  Baker typically carried a firearm that he made visible to his victims.  See PSR ¶ 23, at 10.  In at least two instances, Baker picked up women he had

previously not met and immediately drove them to other cities and states to engage in sex work. See PSR ¶ 23, at 10. One victim reported being drugged into unconsciousness and waking up in another state. See PSR ¶ 23, at 10.

On January 26, 2018, law enforcement interviewed Jane Doe 7, another woman who had worked for Baker. See PSR ¶ 44, at 13. Tobi Stanfill, another sex worker, introduced Jane Doe 7 to Baker, and Baker later sold Stanfill to Cornelius Galloway, another trafficker. See PSR ¶ 14, at 13. Jane Doe 7 reported that Baker physically attacked other sex workers, including striking Stanfill's head with a wooden chair leg and breaking another worker's leg. See PSR ¶¶ 48-49, at 13. After Baker sold Stanfill, she was murdered. See PSR ¶ 44, at 13. Jane Doe 7 also reported that Baker took photographs of Jane Doe 7, which he posted on Backpage.com as advertisements. See PSR ¶ 45, at 13. Baker forced Jane Doe 7 to work every day and required her to earn $1,500.00 a day. See PSR § 45, at 13. Jane Doe 7 earned $80.00 to $200.00 per "date," but Baker collected all the money that she earned. PSR ¶ 45, at 13. The PSR states that Baker gave Jane Doe 7 drugs and "prevent[ed] her from seeing her infant child" when she refused to work. PSR ¶ 45, at 13.

In July or August, 2016, Baker and Williams approached Jane Doe 2 on Central Avenue in Albuquerque. See PSR ¶ 14, at 9. Baker showed Jane Doe 2 a handgun, and told her to get into Baker's car with him and Williams. See PSR ¶ 14, at 9. Baker told Jane Doe 2 that she had "no choice" but to get inside the car. PSR ¶ 14, at 9. Baker and Williams then drove Jane Doe 2 to a hotel in Colorado Springs, where Baker kept other women who were working for him. See PSR ¶ 14, at 9. During the drive to Colorado Springs, Baker bought Jane Doe 2 lingerie at a Walmart, where Baker took photographs of Jane Doe 2 that he posted to Backpage.com. See PSR ¶ 16, at 9. In Colorado Springs, Baker forced Jane Doe 2 to engage in fifteen to twenty "dates." PSR ¶ 17,

at 9.  Jane Doe 2 had to give Baker all the money that she earned.  See PSR ¶ 17, at 9.  On the two

or three instances in which Jane Doe 2 did not give Baker money, he assaulted her and, in one

instance, raped her.  See PSR ¶ 17, at 9.  During Jane Doe 2's time in Colorado Springs, Williams

acted as "guard and security for the victims when Baker was not around."  PSR ¶17, at 9.  In

September, 2016, Jane Doe 2 fled with the help of another sex worker.  See PSR ¶ 18, at 9.

In January, 2017, Baker called the Albuquerque Police Department ("APD") and reported

that Jane Doe 7 had abandoned her infant child after she refused to work.  PSR ¶ 47, at 13.  Baker

told Jane Doe 7 that, if she did not work for him, he could "make money off her baby."  PSR ¶ 47,

at 13.  APD officers visited Baker's apartment, but Baker had already left with Jane Doe 7's child.

See PSR ¶ 47, at 13.  Jane Doe 7 told APD officers that "Baker forcibly took her baby and told her

she needs to make a certain amount of money to get the baby back."  PSR ¶ 47, at 13.  Williams

was present at Baker's apartment during this interview.  See PSR ¶ 47, at 13.

Jane Doe 7 described Williams as Baker's "pimp partner."  PSR ¶ 45, at 13.  Jane Doe 7

said that Williams guarded the sex workers' movements when Baker was not around.  See PSR ¶

46, at 13.  In June, 2017, Baker and Williams took Jane Doe 7 and two other sex workers to

Colorado Springs to engage in sex work.  See PSR ¶ 50, at 14.  Jane Doe 7 reported that, in another

instance, Baker brought another woman back with him to Colorado Springs to engage in sex work.

See PSR ¶ 50, at 14.  The woman reported that Baker drugged her in Albuquerque and she awoke

in Colorado Springs.  See PSR ¶ 50, at 14.

## PROCEDURAL BACKGROUND

On September 11, 2019, a federal Grand Jury issued a twenty-count Superseding

Indictment that charged Baker, Williams, and Inkosi Grandberry with violating 18 U.S.C.

§§ 1591(a)(1) and (d), 2422(a), and 2423(a) and (e).  See Superseding Indictment ¶¶1-20, at 1-8, filed September 11, 2019 (Doc. 153)("Indictment").  The Indictment charges Williams with: (i) two counts of violating § 1591(a)(1), see Indictment ¶¶ 5, 13, at 3, 6; (ii) two counts of violating § 2422(a), see Indictment ¶¶ 6, 14, at 3-4, 6; and (iii) one count of violating § 2421(a), see Indictment ¶ 15, at 6.  On October 15, 2019, Williams pled guilty to Count 6, and admitted to violating 18 U.S.C. §§ 2 and 2422(a).  See Plea Agreement ¶ 8, at 3.  Williams states:

> At some point between June 2016 and September 2016, I, Leotha Williams, went with my co-defendant, Adonis Baker to approach Jane Doe 2 near a bus stop and Central Ave. in Albuquerque, New Mexico.  The two of us made it clear to her that she was to get in our vehicle.  I knew at the time that she would be immediately driven from Albuquerque, New Mexico to Colorado Springs, Colorado for the purpose of working as a prostitute.  I knowingly aided and abetted my co-defendant to persuade Jane Doe 2 to travel in interstate commerce to engage in prostitution.  When we arrived in Colorado Springs, I helped make sure Jane Doe 2 was accounted for and engaged in prostitution.

Plea Agreement ¶ 9, at 4.  The Plea Agreement reflects the United States and Williams' agreement that a sentence of thirty-six to sixty months is appropriate.  See Plea Agreement ¶ 11, at 5.

Although Williams pled guilty to § 2422(a), the USPO uses U.S.S.G. § 2A3.1 to determine his base offense level, because § 2G1.1(c)(1) cross references § 2A3.1.  See PSR ¶ 29, at 11.  The USPO thus calculates a base offense level of 30, whereas, under § 2G1.1(c)(1), Williams' base offense level would be 14.  See PSR ¶ 29, at 11; U.S.S.G. §§ 2A3.1, 2G1.1.  The USPO then adds a series of enhancements, beginning with a 4-level enhancement under U.S.S.G. § 2A3.1(b)(1), because Williams' offense involves conduct that 18 U.S.C. § 2241(a) or (b) describes.  See PSR ¶ 30, at 11.  The USPO then adds a 2-level increase under § 2A3.1(b)(4), which applies if the victim sustained serious bodily injury.  See PSR ¶ 31, at 11.  The USPO further adds a 4-level enhancement under § 2A3.1(b)(5), which applies if the offense conduct involved abduction, and a

2-level enhancement under § 3A1.3, which applies if the victim was physically restrained.  See PSR ¶ 32, at 11.  The USPO then applies a 3-level decrease for Williams' acceptance of responsibility and assistance to authorities.  See PSR ¶¶ 38-39, at 12.  The USPO thus calculates a total offense level of 39.  See PSR ¶ 40, at 12.  Although Williams has a series of convictions, including for felony robbery, these convictions do not factor into Williams' criminal history score, which is zero, because Williams committed the offenses more than fifteen years before this federal offense.  See PSR ¶ 62, at 17; U.S.S.G. § 4A1.2(c), (e)(3).  According to the PSR, Williams' total offense level and criminal history category results in a Guidelines imprisonment range of 262 to 327 months.  See PSR ¶ 114, at 28.  The maximum imprisonment term for § 2422(a), however, is twenty years.  See 18 U.S.C. § 2422(a).

Williams objects to the PSR's inclusion of several of Baker's acts, of which Williams asserts he was unaware.  See First Objections at 2-4.  Williams' primary objection, however, is to the USPO's application of § 2A3.1 rather than § 2G1.1.  See Second Objections at 3-4.  Williams also argues that, if the Court determines that § 2A3.1 applies, the Court should not apply § 2A3.1(b)(5)'s 4-level enhancement, which applies to § 2A3.1 offenses involving abduction.  See Second Objections at 4.  Williams further argues that § 3A1.3's 2-level enhancement for offenses involving physical restraint does not apply.  See Second Objections at 5.  Last, Williams asserts that he played a minimal role in Baker's enterprise such that the Court should apply a mitigating-role adjustment to his offense level.  See Objections at 5-6.  Both the United States and the USPO disagree with each of Williams' objections.  See United States' Response to Defendant Williams' Second Set of Objections to the Presentence Report (Doc. 199) at 4-8, filed March 27, 2020 (Doc. 207)("Response"); Addendum to the Presentence Report at 1-9, filed March 26 2020

(Doc. 202)("Addendum").   The United States agrees, however, that Williams did not hold a managerial or supervisory role in Baker's enterprise, so the United States stipulates to the application of a mitigating-role adjustment.  See Response at 8.

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)    to afford adequate deterrence to criminal conduct;

> (C)    to protect the public from further crimes of the defendant; and

> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section

3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they require careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[1]

---

[1]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory. Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

       While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure

       

    . . . .

       The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States, 552 U.S. 85 (2007), that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an immigrant who illegally re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000)("Apprendi"), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion, and the Sixth

Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (emphasis and citations omitted).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of *Apprendi*'s requirement." (alterations and internal quotations marks omitted)).  More recently, the Supreme Court held that the requirements in Apprendi apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. 99, 103 (2013)("Alleyne").

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and of distributing methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special

interrogatory, attributed to the defendant between 50 and 500 grams of methamphetamine.  See 408 F.3d at 682.  At sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[2]  "[T]he application of an enhancement . . . does not implicate

---

[2]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that

the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No.

CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth

Circuit applies Apprendi's requirement that a fact be submitted to a jury only where the fact would

increase a defendant's sentence "above the statutory maximum permitted by the statute of

conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v.

Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi only where the fact at

issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan,

339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error

under Apprendi, because "his sentence does not exceed the statutory maximum"); United States v.

Hendrickson, 2014 WL 6679446, at *6 (10th Cir. 2014)[3](holding that, after Alleyne, "[i]t is well-

---

increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d
at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance
warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United
States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard
of proof is required to sentence a defendant for committing perjury in relation to a grand jury
investigation, because the enhancement did not require the district court to determine that the
defendant committed murder, but only that he obstructed a homicide investigation). See United
States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-
evidence standard for facts that enhance a defendant's offense level 4 levels); United States v.
Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a
dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of
methamphetamine associated with acquitted charges entitled the defendant to a clear-and-
convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by
binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a
district court need not find by any more than a preponderance of the evidence the amount of
cocaine a defendant distributed, even though its findings increased the defendant's sentence from
twenty years to consecutive forty-year terms).

    [3]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th
Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive
value."). The Tenth Circuit has stated:

established that sentencing factors need not be charged in an indictment and need only be proved

to the sentencing judge by a preponderance of the evidence").  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v.</u>
> <u>United States</u>, . . . expands the rule from <u>Apprendi v. New Jersey</u> . . . (holding that
> facts that increase the maximum sentence a defendant faces must be proven to a
> jury beyond a reasonable doubt), to cover facts that increase the mandatory
> minimum sentence, as well as the maximum sentence, it does not prohibit district
> judges from continuing to find advisory sentencing factors by a preponderance of
> the evidence.  <u>See</u> [<u>United States v. </u>]Sangiovanni, 2014 WL 4347131, at *22-
> 26 [(D.N.M. 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov.

3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, n.1(H).  In <u>United States v.</u>

<u>Booker</u>, the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the real conduct that underlies the crime of conviction.  That determination
> is particularly important in the federal system where crimes defined as, for example,

---

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes <u>United States</u>
<u>v. Hendrickson</u>, <u>United States v. Schmidt</u>, 353 F. App'x 132 (10th Cir. 2009), <u>United States v.</u>
<u>Leroy</u>, 298 F. App'x 711 (10th Cir. 2008), and <u>United States v. Banda</u>, 168 F. App'x 284 (10th
Cir. 2006), have persuasive value with respect to a material issue, and will assist the Court in its
disposition of this Memorandum Opinion and Order.

"obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article
or commodity in commerce, by . . . extortion," . . . can encompass a vast range of
very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be

determined" based on the following:

(1)

(A)    all acts and omissions committed, aided, abetted,
counseled, commanded, induced, procured, or willfully caused by
the defendant; and

(B)    in the case of a jointly undertaken criminal activity
(a criminal plan, scheme, endeavor, or enterprise undertaken by the
defendant in concert with others, whether or not charged as a
conspiracy), all reasonably foreseeable acts and omissions of others
in furtherance of the jointly undertaken criminal activity, that
occurred during the commission of the offense of conviction, in
preparation for that offense, or in the course of attempting to avoid
detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which § 3D1.2(d)
would require grouping of multiple counts, all acts and omissions described in
subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct
or common scheme or plan as the offense of conviction;

(3)    all harm that resulted from the acts and omissions specified in
subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts
and omissions; and

(4)    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not

resulted in a conviction.  Pursuant to § 6A1.3's commentary, evidentiary standards lower than

beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  See 515 U.S. at 404-06.  The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under § 1B1.3, and thus calculated the

defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court

reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the Supreme Court, 18 U.S.C. § 3661 codifies "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw now adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In  United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a

charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. See 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing relevant federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. See 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison. See 11 F.3d at 1515. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,"

it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."   11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1314-15 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. 2012)(Browning, J.).  The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence.  See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. 2012)(Browning, J.).  Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated," is relevant information which the Court can consider in fashioning a proper sentence.  United States v. Romero, No. CR 09-1253 JB 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).  See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. Dec. 14, 2017)(Browning, J.).

## ANALYSIS

Many of Williams' Objections are based on his argument that the Court cannot rely on the PSR's factual summary, because there is insufficient evidence that Williams was aware of Baker's actions.  See, e.g., First Objections at 4 ("There is no[] evidence in discovery that Mr. Williams was aware of any sexual activity between Jane Doe 7 and Mr. Baker.").  Conduct's relevance to Williams' sentence does not necessarily depend, however,  on Williams' awareness at the time the conduct occurred.  Accordingly, the Court generally overrules the First Objections.  The Court similarly concludes that the PSR properly cross references U.S.S.G. § 2A3.1, because Williams' offense involved conduct that 18 U.S.C. § 2241(a) describes -- threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping.  Next, the Court concludes that § 2A3.1(b)(5)'s 4-level enhancement is proper, because Baker, brandishing a firearm, forced Jane Doe 2 to get into a car with him and Williams in Albuquerque and drove her to Colorado Springs, which amounts to abduction.  The Court further concludes that § 3A1.3's 2-level enhancement applies to Williams' offense level, because Williams aided Baker in forcibly preventing sex workers from leaving Baker, including by standing guard outside the victims' hotel rooms.  Next, the Court concludes that Williams is substantially less culpable then the average participant in Baker's criminal enterprise such that § 3B1.2's 4-level adjustment is proper.  Last, the Court concludes that a § 2A3.1(b)(4)'s 2-level enhancement does not apply, because Williams' victim did not sustain serious bodily injury.  Accordingly, the Court sustains in part and overrules in part the First Objections and the Second Objections.

**I.   THE PSR'S FACTUAL SUMMARY IS MOSTLY ACCURATE, AND WILLIAMS NEED NOT BE AWARE OF ALL OF BAKER'S ACTIONS FOR THOSE ACTIONS TO FACTOR INTO WILLIAMS' OFFENSE CONDUCT.**

The primary argument that Williams advances in the First Objections is that he was unaware of several of Baker's criminal actions, and so those actions should not be included in the PSR's summary of Williams' offense. The Court concludes that, while Williams' knowledge or lack thereof is relevant to his sentence, most of Baker's actions against which Williams lodges his Objections are foreseeably within the scope and in furtherance of Baker, Grandberry, and Williams' jointly undertaken criminal activity. Accordingly, the Court generally overrules the First Objections.

A. **THE UNITED STATES MUST DEMONSTRATE THAT THE DEPARTMENT OF HOMELAND SECURITY CONSIDERED BAKER THE MOST ACTIVE TRAFFICKER IN ALBUQUERQUE.**

Williams objects to the PSR's ¶ 11, at 8, to the extent that it characterizes Baker as "the most active trafficker in Albuquerque." PSR ¶ 11, at 8. See First Objections at 1-2. Williams says that discovery "suggest[s] a limited number of potential victims" and so contradicts the PSR's characterization. First Objections at 1. Williams also complains that he has not received "any statistical analysis that would support this statement," which would "require expert knowledge and testimony." First Objections at 2. Williams further objects to the PSR's statement that, "[l]ike most victims of human trafficking, [Baker's] victims were afraid of him and were hesitant to cooperate with law enforcement due to fear of retaliation." PSR ¶ 11, at 8. See First Objections at 2. Williams avers that this statement "would require extensive expert testimony concerning psychological issues," and Williams contends that law enforcement spoke with "several . . . purported witness" who "often readily spoke with law enforcement." Second Objections at 2.

The PSR states that the United States Department of Homeland Security ("DHS") "considered Baker to be the most active trafficker in Albuquerque." PSR ¶ 11, at 8. The PSR thus

does not assert that Baker was the most active trafficker in Albuquerque, but rather that DHS considered him so.  The question is thus whether there is sufficient evidence that DHS held this opinion of Baker.  The United States says that a DHS special agent, whom the United States describes as "a sex trafficking expert," "will testify that this was his perception at the time he was investigating this case."  First Response at 1.  The Tenth Circuit has long held that "sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).  Here, the Court will require the United States to present the DHS witness, because the United States' characterization of what the DHS witness will say is not reliable evidence that Baker was the most active sex trafficker in Albuquerque.  See Fed. R. Crim. P. 32(i)(3)(B); United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008)(noting that courts may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard).  The United States offers no evidence, other than a promise to have the DHS agent testify, to support the PSR's description.  Accordingly, the Court sustains the Objection and, unless the United States presents the DHS witness, the PSR will be amended to omit the USPO's characterization of DHS' views of Baker.

**B.    BAKER'S ADVERTISEMENTS IN OTHER STATES IS NOT RELEVANT TO WILLIAMS' OFFENSE CONDUCT, BECAUSE THAT ACTIVITY IS BEYOND THE SCOPE OF WILLIAMS' AGREEMENT.**

Williams next objects to the PSR's ¶ 12, at 8, which provides: "Baker was known to utilize Backpage.com to post advertisements in New Mexico and throughout the United States for commercial sex services, including in Texas, Colorado, Arizona, Nevada, Illinois, Tennessee, Alabama, Missouri, Kansas, and Virginia."  PSR ¶ 12, at 8.  Williams does not assert that this

information is inaccurate, but rather that "[t]hese appear to be references to separate offenses and/or conspiracies in which Mr. Williams was not involved.  Mr. Williams' conduct should be limited to the admitted conduct in New Mexico and Colorado."  First Objections at 2.  The United States does not respond directly to Williams' Objection, asserting instead that the "statement is accurate, and should remain."  First Response at 2.  The USPO more directly responds and states: "The information is necessary to show the full scope of the defendant's conduct, and the conduct of other defendants, as it pertains to their ongoing and jointly undertaken sex trafficking activity." Addendum at 2.

The information is relevant to Williams' offense.  Under U.S.S.G. § 1B1.3(a)(1), relevant conduct in a jointly undertaken criminal activity is "all acts and omissions of others" that were: (i) within the scope of the jointly undertaken activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.  U.S.S.G. § 1B1.3(a)(1)(B).  In the Guidelines application notes, the United States Sentencing Commission emphasizes that these requirements are conjunctive and so "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy."  U.S.S.G. § 1B1.3 note 2.  The United States Sentencing Commission clarifies that a sentencing court must "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake," adding that "the conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision."  U.S.S.G. § 1B1.3 note 2.  The application note provides a hypothetical scenario of two defendants agreeing to commit a robbery and, during the course of that robbery, the first defendant assaults a victim.

See U.S.S.G. § 1B1.3 note 3.  The Guidelines provide that the second defendant is accountable for the assault, "even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone," because the assault is foreseeably within the scope, and in furtherance, of the jointly undertaken activity.  U.S.S.G. § 1B1.3 note 3.  Similarly, if a defendant is one of ten persons that a principal defendant hired to off-load a ship containing drugs, the defendant is accountable for the entire ship's contraband.  See U.S.S.G. § 1B1.3 note 4(A)(i). The United States Sentencing Commission provides that the defendant is accountable for the contraband regardless of his or her knowledge of the extent of the criminal activity.  See U.S.S.G. § 1B1.3 note 4(A)(i).

Here, Williams pled guilty to one count of aiding and abetting the coercion of another to travel in interstate commerce to engage in prostitution.  See Plea Agreement ¶ 8, at 3-4.  As the United States Court of Appeals for the Eleventh Circuit has explained in United States v. Blanc, 146 F.3d 847 (11th Cir. 1998), § 1B1.3(a)(2)'s purpose is "to take account of a 'pattern of misconduct that cannot readily be broken into discrete identifiable units that are meaningful for purposes of sentencing,'" and where "the conduct is subject to meaningful subdivision into wholly discrete and identifiable units," it is not relevant for Guidelines purposes.  146 F.3d at 852-53 (quoting United States v. Maxwell, 34 F.3d 1006, 1010 (11th Cir. 1994)).  Here, the offense to which Williams admits involved operations in two states.  See Plea Agreement ¶ 9, at 4.  Williams agreed to help Baker maintain a trafficking enterprise in New Mexico and Colorado that involved posting advertisements.  See Plea Agreement ¶ 9, at 4.  Although it may have been foreseeable that Baker would post advertisements in more than one state, there is no evidence that Williams agreed to such a broad geographical operation.  Baker's additional actions posting advertisements

in other states not within the scope of Williams' jointly undertaken criminal activity.  Further, there is no other evidence of Baker's activities in states other than New Mexico and Colorado, so activity in other states may be separated without eroding the PSR's narrative of the conduct in New Mexico and Colorado.  Accordingly, the Court sustains the Objection.

   C.   **BAKER'S USE OF A HANDGUN IN COERCING JANE DOE 2 IS RELEVANT TO WILLIAMS' OFFENSE, REGARDLESS OF WILLIAMS' SPECIFIC KNOWLEDGE.**

   Williams next objects to the PSR's ¶ 14, at 9, to the extent that the PSR says that Baker showed Jane Doe that he carried a handgun when he picked up Jane Doe 2 on Central Avenue in Albuquerque.  See First Objections at 3.  Williams says that he admits to aiding in "*persuading* [Jane Doe 2] to get in the vehicle," but that he was "unaware any weapons were displayed."  First Objections at 3 (emphasis in First Objections).  Williams notes that the United States has not recovered or seized the firearm in question, and further asserts that "his aversion to firearms is real and visceral," because his significant other died from a gunshot wound in the 1990s.  First Objections at 3.  Williams says that he would "not have willingly involved himself in any activity with a firearm."  First Objections at 3.  Williams thus avers that the evidence on which the PSR relies -- Jane Doe 2's statements -- is not reliable.  See First Objections at 3.  The United States responds that "victim after victim in this case recounts co-Defendant Baker possessing a firearm."  First Response at 2.  The United States further notes that Williams committed armed robbery with a handgun in 1993 and that the PSR documents that Williams "has 38 contacts with law enforcement," several of which "involved the use of a weapon."  First Response at 2-3.  The United States thus avers that "it is a very hard sell to present Williams as ignorant to the fact that a gun was used regularly in this crime."  First Response at 3.

The Court agrees with the United States that Baker's use of a firearm is relevant to Williams' sentence -- it is probative of whether and the extent to which Williams' offense involved coercion.  As a preliminary matter, however, both parties err in using propensity evidence to advance their positions.   An "offense," as the Guidelines defines, includes the "offense of conviction and all relevant conduct under § 1B1.3"  United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998).  Section 1B1.1 of the Guidelines provides that sentencing courts shall calculate a defendant's Guidelines sentence "on the basis of" "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a) and (a)(1)(A). Section 1B1.3 embodies the principle that the sentence should reflect the offense's seriousness, and so courts should consider all conduct relevant to determining that seriousness.  See United States v. Allen, 488 F.3d 1244, 1255 (10th Cir. 2007).  The Guidelines thus "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction."  United States v. Tagore, 158 F.3d at 1128.  The conduct that a sentencing court may consider, therefore, "comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct."  United States v. Allen, 488 F.3d at 1254-55.  The Court may consider only relevant conduct, however, and this "relatedness principle is fundamental because of our commitment to sentencing based on the seriousness of the actual offense proven or admitted."  United States v. Allen, 488 F.3d at 1255.  This limiting principle is based on the Sixth Amendment: "If the considered conduct has nothing to do with the offense of conviction, the court is effectively sentencing a defendant for a crime that was never proved to the jury . . . ."  United States v. Allen, 488 F.3d at 1255.

The parties make propensity arguments.  Rule 404 of the Federal Rule of Evidence's distinction between propensity and "another purpose," Fed. R. Evid. 404(b)(2), is analogous to the Guidelines' distinction between an offense's characteristics and an offender's characteristics.  See United States v. Allen, 488 F.3d at 1254; Douglas A. Berman, Conceptualizing Blakely, 17 Fed. Sent'g Rep. 89, 89-90 (2004)(distinguishing between offense characteristics and offender characteristics).  Relevant conduct determines the overall offense level, while the defendant's characteristics relating to the risk of recidivism -- typically past criminal conduct -- relate to the defendant's criminal history category.  See U.S.S.G. §§ 1B1.3 (relevant conduct), 4A1.1, 4A.3.(a)(2)(E) (criminal history).

> Conduct related to the offense of conviction is treated as an offense characteristic, whereas past criminal convictions are generally treated as an offender characteristic, and taken into account by assigning a criminal history score. . . . Future dangerousness also is an offender characteristic.  Because evaluation of future dangerousness could otherwise veer into speculation, it generally is evaluated on the basis of the defendant's recidivism, which takes into account prior convictions and prior similar adult misconduct.  United States Sentencing Guidelines Manual §§ 4A1.1, 4A.3.(a)(2)(E).

United States v. Allen, 488 F.3d at 1254.

The United States thus errs in relying on Williams past crimes -- which happened almost thirty years ago -- in contending that Williams must have been aware that Baker carried and used a firearm in intimidating or coercing his victims.  The United States makes what amounts to a rule 404(b) argument that, because Williams used a firearm in his previous crimes, it is probable that he was fine with Baker using a firearm here.  See First Response at 3.  Under rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Similarly, Williams argues that, because his significant other was murdered with

a firearm, Williams would not knowingly associate with anyone who uses a firearm.  <u>See</u> First

Objections at 3.

Both parties' arguments run counter to rule 404(b) and are not based on information that is

sufficiently reliable to be probative.  <u>See</u> U.S.S.G. § 6A1.3 ("In resolving any dispute concerning

a factor important to the sentencing determination, the court may consider relevant information

without regard to its admissibility under the rules of evidence applicable at trial, provided that the

information has sufficient indicia of reliability to support its probable accuracy.").  Moreover, a

preponderance of the evidence -- without relying on propensity arguments -- demonstrates that

Baker and Grandberry routinely carried and used firearms in maintaining their control over the

victims.  Jane Doe 2 reported that Baker displayed a firearm when he told her to get into his car.

<u>See</u> PSR ¶ 14, at 9; Addendum at 3; First Response at 3.  There are also several other reports of

Baker and Grandberry displaying firearms to intimidate their victims.  <u>See</u> PSR ¶ 23, at 10 ("Most

victims reported Baker and codefendants usually possessed a firearm.  The defendants used

physical force and violence, threats of violence, and sexual violence.").  Baker thus frequently

used a firearm in service of a criminal enterprise which Williams agreed to further.

In this way, Williams' specific knowledge that Baker held and brandished a firearm when

he picked up Jane Doe 2 is not necessary for those actions to factor into Williams' offense conduct.

<u>See</u> U.S.S.G. § 1B1.3 note 4(A)(i)(providing that a defendant who agrees to further a principal's

scheme is accountable for the principal's foreseeable actions "regardless of his knowledge or lack

of knowledge").  The standard under § 1B1.3 is whether the codefendant's actions are "within the

scope of the agreement and reasonably foreseeable to [the defendant]."  <u>United States v. Arias-</u>

<u>Santos</u>, 39 F.3d 1070, 1078 (10th Cir. 1994).  Conversely, a defendant's mere knowledge of a

codefendant's criminal conduct is not sufficient.  "The scope requirement is key: it means that just knowing of coconspirators' illicit activities, without more, will not suffice to attribute such activities to a defendant unless the activities are also within the agreement's scope."  United States v. Biglow, 635 F. App'x 398, 401 (10th Cir. 2015)(unpublished).  Accordingly, defendants are responsible for a codefendant's criminal conduct that was "in furtherance of the jointly undertaken criminal activity" and "reasonably foreseeable in connection with that criminal activity."  United States v. Figueroa-Labrada, 720 F.3d 1258, 1265 (10th Cir. 2013).

Baker's use of a firearm in picking up Jane Doe 2 was reasonably foreseeable and in furtherance of jointly undertaken activity in which Williams agreed to participate.  Williams admits, in the Plea Agreement, that he and Baker "made clear to [Jane Doe 2] that she was to get in our vehicle."  Plea Agreement ¶ 9, at 4.  Further, Williams admits that, before he and Baker picked up Jane Doe 2, Williams knew that they planned to take her to Colorado Springs to engage in sex work.  See Plea Agreement ¶ 9, at 4.  Williams thus agreed to assist in conduct that required overcoming Jane Doe 2's resistance.  That Baker would use a firearm in overcoming Jane Doe 2's resistance is thus foreseeable and in furtherance of the scheme.  See United States v. Figueroa-Labrada, 720 F.3d at 1265 (noting importance of determining "the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole," regardless of the defendant's specific knowledge of the coconspirator's planned actions); U.S.S.G. § 1B1.3 note 2 (providing several hypothetical applications of this rule).  The Court thus overrules Williams' Objection.  Nonetheless, the Court notes that the United States has not offered reliable evidence that Williams was specifically aware of Baker's use of the firearm.  Accordingly, the PSR's

summary of Williams' version of the offense should be amended to include Williams' assertion there is no evidence that he was aware of the firearm.

####     D.     BAKER'S SEXUAL ABUSE FALLS WITHIN WILLIAMS' OFFENSE CONDUCT.

Williams next objects to the PSR's ¶ 17, at 9, which discusses Baker's repeated sexual assault of Jane Doe 2 in Colorado Springs as well as Baker supplying Jane Doe 2 with methamphetamine. See First Objections at 3. Williams says that it is "inappropriate" to rely on these assaults in determining his sentence, because the assaults are not a " known part of any joint activity in which Mr. Williams was involved." First Objections at 3. The United States responds that the PSR's narrative is proper, because it was Williams "job to guard [Jane Doe 2] while Baker was away," typically when Baker "would make trips from Colorado back to Albuquerque to pick up narcotics." First Response at 3. The USPO adds that it will include Williams' assertion in the PSR's section summarizing Williams' version of the events. See Addendum at 2-3. The USPO avers, however, that Baker's assault and drugging of Jane Doe 2 is sufficiently related to criminal activity that Williams specifically agreed to further. See Addendum at 3.

Baker's criminal conduct undoubtedly involved despicable acts meant to exert and maintain control over his victims. See, e.g., PSR ¶¶ 45-48, at 12-13. Baker targeted vulnerable women -- such as women addicted to drugs or without homes -- and lured them into his control with promises of drugs and shelter. See PSR ¶ 23, at 10. Baker then used intimidation and force -- including sexual violence -- to keep his victims in line, and drugs to maintain their dependence on him. See, e.g., PSR ¶ 46, at 13. Williams acted as the scheme's low-level enforcer. See PSR ¶ 24, at 11. When Baker was not around, Williams stood guard outside the women's hotel rooms -- not only to protect them from immediate harm, but also to prevent their fleeing. See PSR ¶ 46,

at 13.  One victim reports that Williams "guarded the victims' movements."  PSR ¶ 46, at 13.  As with Baker's use of a firearm, Baker sexually assaulting victims was a means to control those victims, and Williams knowingly assisted Baker in maintaining that control by guarding their movements when Baker was not around.  In an enterprise that involved controlling and using women's bodies, it was reasonably foreseeable that Baker would assault women he was forcing to do sex work to ensure their subservience.  Those assaults took place within criminal conduct in which Williams was a knowing participant.  See U.S.S.G. § 1B1.3.  The Court will, however, direct that the PSR's summary of Williams' version of events reflects Williams' statement that he was unaware of these assaults, because, per the PSR, Williams' presence with the victims typically corresponded with Baker's absence.  See PSR ¶ 46, at 13.  Accordingly, although the Court directs that the PSR's summary of Williams' version of events be amended, Baker's assaults are properly included within Williams' offense conduct, and the Court overrules the Objection.

### E.  THE PSR PROPERLY CHARACTERIZES JANE DOE 2's FLEEING AS AN ESCAPE.

Williams next objects to the PSR's characterization of Jane Doe 2's leaving Baker as an escape.  See First Objections at 3-4.  Williams contends that he interviewed "workers at other hotels in the Albuquerque area familiar with this case, and those individuals have verified that women were free to come and go from the property."  First Objections at 3.  Williams further contends that women who worked for Baker engaged in sex work before and after working for Baker, which Williams contends demonstrates that Jane Doe 2 did not need to escape from working for Baker.  See First Objections at 4.  The United States responds that Williams' "vague[]" statement about employees at Albuquerque hotels "means nothing."  First Response at 3-4.  "To the contrary," the United States avers, "a hotel worker will say they never observed such a thing,

especially when asked by a lawyer or a lawyer's investigator," because [s]uch admissions would be very bad for business."  First Response at 4.  The United States further contends that, in "trafficking culture, not a lot of victims are going to make a scene in public to expose their abuse," and the United States says that the DHS agent "will testify that there would likely be very dire consequences for such behavior."  First Response at 4.  As for Williams' contention that other workers said that they "could have left," First Objections at 4, the United States avers that these women likely meant that, while they "literally" could have left, they then would have been "homeless, without food or drugs, and likely face a brutal beating on their way out."  First Response at 4.

The Tenth Circuit has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d at 1105 (quoting United States v. Washington, 11 F.3d at 1516).  Here, Williams objects not to the fact that Jane Doe 2 left Baker with another sex worker's help, but rather the PSR's characterization of Jane Doe 2's leaving as an escape.  See First Objections at 3-4.  The fact at issue, then, is whether Jane Doe 2 was free to leave Baker's employment at any time.  "Escape" means "to get free from a dangerous or confining situation."  Merriam-Webster  Dictionary,  "Escape,"  https://www.merriam-webster.com/thesaurus/escape (last accessed June 20, 2020).  Here, there is sufficient evidence that, when Jane Doe 2 left Baker's employment, she was getting free from a dangerous or confining situation.  Williams pled guilty to assisting Baker in forcing Jane Doe 2 -- a complete stranger, someone whom they had just seen waiting at a bus stop -- to get into their car and taking Jane Doe 2 from Albuquerque to Colorado Springs to do sex work for Baker.  See Plea Agreement ¶ 9, at 4.  Jane Doe 2 reports that Baker "forced" her to engage in fifteen to twenty dates in Colorado Springs.

<u>See</u> PSR ¶ 17, at 9.  Moreover, Baker required Jane Doe 2 to give him all her work's earnings.
<u>See</u> PSR ¶ 17, at 9.  When Jane Doe 2 did not give Baker her earnings, he abused her, including,
on at least one occasion, raping her.  <u>See</u> PSR ¶ 17, at 9.  Jane Doe 2 was thus in an unfamiliar
city, forced to work but unable to earn money for herself.  <u>See</u> PSR ¶¶ 16-17, at 9.  These
circumstances are sufficient to characterize Jane Doe 2's leaving as an escape.  This escape is also
properly included within Williams' offense narrative, because he assisted Baker in maintaining
control over Jane Doe 2 by guarding her movements when Baker was not around.  <u>See</u> PSR ¶ 17,
at 9.  The Court thus overrules the Objection.

### F.   THAT BAKER'S ORGANIZATION WAS EXTENSIVE IS NOT ATTRIBUTABLE TO WILLIAMS.

Williams next objects to the PSR's characterization of Baker's trafficking operation as
"extensive."  First Objections at 4.  Williams says that he "had no knowledge of an 'extensive
organization' and has been given no basis for a claim of who may or may not be 'the most
significant sex trafficker in Albuquerque.'"  First Objections at 4 (quoting PSR ¶ 23, at 10).  The
United States disagrees and asserts that Baker's "victims were numerous."  First Response at 4.
The United States further says that "Grandberry and Williams aided and abetted Baker in his
extensive organization that included the three of them, and the numerous women they trafficked."
First Response at 4.  The United States says that the DHS agent will testify that Baker's
organization is properly considered extensive.  <u>See</u> First Response at 4.

The Court sustains the Objection.  This instance is one in which Williams' knowledge is
relevant.  A defendant's accountability for others' acts depends on the scope of the defendant's
agreement: "Acts of others that were not within the scope of the defendant's agreement, even if
those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under

subsection (a)(1)(B)."  U.S.S.G. § 1B1.3 n.3(B).  Williams agreed to assist Baker in recruiting and

maintaining control over sex workers in New Mexico and Colorado.  As the Court concludes

below, Williams acted as a low-level enforcer in Baker's enterprise.  While Baker's organization

may have been extensive -- the PSR's characterization suggests that it was -- there is insufficient

evidence that Williams specifically agreed to assist in an extensive organization, rather than

assisting Baker in more limited instances of the organization's operations.  See U.S.S.G. § 1B1.3

n.3(B).  Accordingly, the Court sustains the Objection.

### G.   THE PSR'S INFORMATION ABOUT TOBI STANFILL AND CORNELIUS GALLOWAY IS RELEVANT TO WILLIAMS' BACKGROUND, CHARACTER, AND CONDUCT.

Williams next objects to a portion of the PSR's ¶ 44, at 13, which states that one of Baker's

victims, who "has since been murdered and is suspected to have been sold by Adonis Baker to

Cornelius Galloway (another federal defendant convicted of sex trafficking during this time, case

number 17CR1235WJ)," introduced Jane Doe 7 to Baker.  PSR ¶ 44, at 13.  See First Objections

at 4.  Williams says that he "has not been provided with discovery in relation to" the other cited

case "to verify, or challenge, the information suggested."  First Objections at 4.  Williams says

that, "[i]f this information is material to sentencing, that discovery would qualify as Brady[ v.

Maryland, 373 U.S. 83 (1963)("Brady"),] material and should have been disclosed in full to the

defense."  First Objections at 4.  Williams also avers that "there is no allegation that [he] was

connected to" Cornelius Galloway's activities, the individual to whom Baker "sold" Stanfill.  PSR

¶ 44, at 13.  See First Objections at 4.  Last, Williams argues that including this allegation "may

unfairly prejudice him with the United States Bureau of Prisons classification system."  First

Objections at 4.  The United States says that the PSR does not allege that Williams is "connected

to the Galloway organization, or that he participated in any way with" Stanfill's murder.  First Response at 5.  The United States argues, however, that the PSR's ¶ 44, at 13, is "necessary to explain how Jane Doe 7 became introduced to Baker and ultimately Williams, who[m] she described as Baker's 'pimp partner.'"  First Response at 5 (quoting Jane Doe 7).

Although not necessary to resolve the Objection, the Court notes that there is no reason to suspect that the Stanfill-Galloway information is "Brady material [that] should have been disclosed in full to the defense."  First Objections at 4.  The Due Process Clause of the Fifth Amendment to the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not intrinsically exculpatory.  See Giglio v. United States, 405 U.S. 150 (1972); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  The prosecution's Brady obligations extend to the sentencing phase.  See Brady, 373 U.S. at 87.

The Fifth Amendment does not, however, "require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Brady requires disclosure only of evidence that

is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).

Here, Williams asserts that information about Galloway and Stanfill is "material to sentencing" and so the United States should have disclosed this information to Williams. First Objections at 4. Williams does not, however, explain why this information is material to Williams' sentence. Williams does not contend that the Galloway-Stanfill information is exculpatory. To the contrary, the United States contends that this information is necessary to paint a full picture of the extent of Williams' culpability. See First Response at 5 (asserting that the PSR's ¶ 44, at 13, is "necessary to explain how Jane Doe 7 became introduced to Baker and ultimately Williams, who she described as Baker's 'pimp partner.' T.S. and Jane Doe 7 were victimized by Baker and Williams at the same time. Therefore, T.S. is relevant to this case and to Williams' participation." (quoting Jane Doe 7)). The United States, therefore, had no duty to disclose the Galloway/Stanfill information. Because there is no information suggesting that this information is exculpatory, the United States had no duty to disclose it. See, e.g., United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011); United States v. Page, 808 F.2d 723, 730 (10th Cir. 1987). The Court notes that

ethical rules require prosecutors to "'disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.'" Cone v. Bell, 556 U.S. 449, 470 n.15 (2009)(quoting Am. Bar Ass'n Model Rules of Professional Conduct 3.8(d) (2008)). The Supreme Court has not, however, held that the Fifth Amendment requires such disclosure. See Cone v. Bell, 556 U.S. at 470 n.15 ("Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations."). Finally and most importantly, the United States says that it disclosed this information to each Defendant before any of them pled guilty. See First Response at 4-5. There is thus no Brady issue here.

The portion of the PSR to which Williams objects is expressly listed as "Offense Behavior not Part of Relevant Conduct." PSR ¶ 41, at 12. The information is thus not part of Relevant Conduct, but is part of Williams' Offense Behavior. Neither the PSR nor the United States alleges that Williams has any connection to Galloway or Stanfill apart from their mutual association with Baker. See Addendum at 5; First Response at 5. The Court has previously overruled a defendant's objections to the information in a presentence report, under the section entitled "Offense Behavior Not Part of Relevant Conduct," where the defendant argued that the information is not pertinent to sentencing and "takes into consideration uncharged allegations that other witnesses made." United States v. Sandoval, 506 F. Supp. 2d 582, 593 (D.N.M. 2007)(Browning, J.). The Court explained that "it is proper for the Court to consider this information to ascertain [the defendant] Sandoval's life and background." 506 F. Supp. 2d at 593. The Court noted that the USPO

maintained that the information had sufficient "indicia of reliability," and that the information was necessary to fully gauge Sandoval's conduct within the brief time period during the charged offenses were committed.  506 F. Supp. 2d at 593.  Based upon U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v. United States, the Court overruled Sandoval's objection and considered the information.  See United States v. Sandoval, 506 F. Supp. 2d at 593.

        "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  The information about Galloway and Stanfill is relevant to determining the nature of the Defendants' criminal enterprise.  It is probative of the danger that the victims faced and the cavalier, cruel manner in which the Defendants treated their victims.  See PSR ¶ 44, at 13 (providing that Baker "sold" Stanfill to Galloway); id. ¶ 47, at 14 (providing that Baker "sold" another woman to a man in Phoenix, Arizona, for $7,000.00).  The information also demonstrates how Jane Doe 7 came to work for Baker and validates her characterization of Williams as Baker's "pimp partner."  PSR ¶ 44, at 13.  The PSR's ¶ 44, at 13, is thus "information concerning [Williams'] background, character, and conduct."  18 U.S.C. § 3661.  See U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.").  The Supreme Court intends for district courts to consider a defendant's real conduct when effectuating Congress' purposes set forth in the Sentencing Guidelines.  See United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *4 (D.N.M. June 26, 2012)(Browning, J.)(citing United States v. Booker,

543 U.S. at 250-51).  The Supreme Court has recognized that 18 U.S.C. § 3661 is an embodiment

of the "the longstanding principle that sentencing courts have broad discretion to consider various

kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's

discretion."  United States v. Watts, 519 U.S. at 151-52.  Because the information is relevant to

Williams' background, character, and conduct, the Court overrules the Objection.

### H. IT IS RELEVANT THAT BAKER RAPED JANE DOE 7 AND THAT WILLIAMS GUARDED JANE DOE 7'S MOVEMENTS WHEN BAKER WAS NOT AROUND.

Williams objects to the PSR's narrative, also included in the "Offense Behavior not Part of

Relevant Conduct" section, that says that: (i) Baker raped Jane Doe 7 "approximately five times;

(ii) Baker owned a handgun that he kept in his apartment and the hotel rooms that he used; (iii) Jane

Doe 7 had been to Baker's apartment in Albuquerque, and Baker gave Jane Doe 7 a "track phone";

(iv) Jane Doe 7 said that Williams "often guarded the victims' movements when baker was not

there"; and (v) Jane Doe 7 described Grandberry as "another one of  Baker's coconspirators, and

[other coconspirators and victims] assisted in posting Backpage.com advertisements."  PSR ¶ 46,

at 13.  See First Objections at 4.[4]  Williams says that Jane Doe 7's statement that Williams guarded

her when Baker was not around suggests that he "would not be aware" of the activity that the

PSR's ¶ 46, at 13, describes.  First Objections at 4.  The United States says that it does not allege

that Williams knew that Baker raped Jane Doe 7, but the United States avers that, "[c]learly,

Williams was aware of something nefarious if it was his job to guard Jane Doe 7 when Baker was

not there."  First Response at 5.

---

[4]Williams says that he "objects to the first three and last two sentences of Paragraph 46."
First Objections at 4.  The PSR's ¶ 46, at 13, however, contains five sentences, so the Court
construes Williams' Objection as to the paragraph in its entirety.

The PSR's portion to which Williams objects falls under the PSR's section entitled "Offense Behavior Not Part of Relevant Conduct." PSR ¶ 41, at 11. The information is thus not part of Relevant Conduct, but is part of his Offense Behavior. As with the previous Objection, the information about how Baker treated his victims, and the role that Williams played in enforcing Baker's control over the victims, are relevant to Williams' "background, character, and conduct." 18 U.S.C. § 3661. Moreover, Williams does not object to the information's veracity such that the Court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Williams, instead, asserts that he was unaware of Baker's rapes. These remarks do not satisfy Williams' "affirmative duty to make a showing that the information in the PSR was unreliable and articulate the reasons why the facts contained therein [are] untrue or inaccurate." United States v. Rodriguez-Delma, 456 F.3d 1246, 1253 (10th Cir. 2006). Williams has pointed to no facts which call into question the accuracy of the PSR's ¶ 46, at 13. The Court thus overrules the Objection.

## I.  SUFFICIENT EVIDENCE SUPPORTS CONCLUDING THAT BAKER THREATENED JANE DOE 7 BY CALLING TO POLICE TO REPORT THAT SHE HAD ABANDONED HER BABY.

Williams next objects to the PSR's ¶ 47, at 13. See First Objections at 5. That paragraph states:

> In January 2017, Baker called the Albuquerque Police Department (APD) and reported Jane Doe 7 as abandoning her child when she refused to work on East Central. Her son was at Baker's apartment at the time. Baker told her that if she did not make money for him, he could "make money off her baby." APD and [a social worker from the New Mexico Children, Youth, and Families Department ("CYFD")] responded to Baker's apartment. By the time APD arrived, Baker had already taken the child to another location. CYFD ultimately removed [Jane Doe 7's] child from her care. This account is corroborated by an APD report and lapel

videos where [Jane Doe 7] is telling her friend and her mom that Baker forcibly took her baby and told her she needs to make a certain amount of money to get the baby back.  Leotha Williams was present during this incident as well.

PSR ¶ 47, at 13.  Williams says that the paragraph "misstate[s]" APD's investigation.  First Objections at 5.  Williams argues that the PSR's assertion that Baker took [Jane Doe 7's] child is "based on a report to police that came through multiple layers of hearsay, not from Jane Doe 7 herself," and that Jane Doe 7 has "refused to speak with or meet with law enforcement."  First Objections at 5.  Williams further contends that Jane Doe 7 "was a long-time drug abuser and sex worker with significant credibility concerns, including continuously abandoning her children in favor of drugs and sex work," and that "she eventually lost her children through CYFD proceedings unconnected to Mr. Williams."  First Objections at 5.  Williams then asserts that Baker calling APD to report the child's abandonment "undercut[s]" Jane Doe 7's story about abduction.  First Objections at 5.

The United States elaborates on the PSR's ¶ 47, at 13.  See First Response at 5.  The United States says that, in January, 2017, Jane Doe 7 told her friend that Baker "was holding her baby as leverage to cause her to walk the track as a prostitute."  First Response at 5.  The United States says that this friend told APD officers that she went to Baker's apartment to check on the baby and that the baby was unattended.  See First Response at 5-6.  The United States says that Baker then told the friend that she "'need[ed] to bring [Jane Doe 7] here'" and that the friend told APD officers her belief that, if Jane Doe 7 went to Baker's apartment, he would assault Jane Doe 7.  First Response at 6 (quoting Baker).  The United States also says that the friend told APD officers her belief that Baker held the baby, because Jane Doe 7 refused to work on Central Avenue in Albuquerque the previous night.  See First Response at 6.  The United States says that the friend

also "described . . . another male individual who was there, and stated she believed they were

working together."  First Response at 6.  The United States then relates that an APD officer called

Jane Doe 7 but that Jane Doe 7's statements are inaudible in the officer's lapel camera footage.

See First Response at 6.  The United States asserts, however, that "one can infer what she reported

from the officer's responses," which reveal that Jane Doe 7 said that she was working for Baker,

and that Baker kicked Jane Doe 7 out a car and took her baby against her will.  First Response at 6.

The United States says that, when the APD officer returned to Baker's apartment, they met Baker

and Williams, who wore "a baby-blue three-piece suit, with a tie and white shoes."  First Response

at 6.  The United States reports that Baker referred to Jane Doe 7 as a girlfriend and that he had

left Jane Doe 7's baby with her sister.  See First Response at 7.  According to the United States,

Jane Doe 7 spoke with DHS agents a year later and said that Baker threatened her by warning that,

"if she did not make money for him, he could make money off her baby," and that this threat

compelled her to continue working for Baker.  First Response at 7.

      The United States acknowledges that Jane Doe 7 struggles with drug addiction and with

caring for her children, but asserts that Baker used these struggles to "exploit her."  First Response

at 7.  According to the United States, Baker did not call APD out of concern that Jane Doe 7 had

abandoned her baby, but rather as "retaliation for her not doing what he wanted her to do," and so

his calling the police "does not 'undercut' anything."  First Response at 7 (quoting First Objections

at 5).  The United States, instead, asserts that Baker's APD call "is substantive evidence of him

using threats and coercion to cause [Jane Doe 7] to engage in prostitution," and that "all that time,

Leotha Williams was there too."  First Response at 7.

That Williams makes a factual contention does not necessarily require the Court to "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). To invoke a district court's rule 32 fact-finding obligation, a defendant is required to make "specific allegations" of factual inaccuracy. United States v. Rodriguez-Delma, 456 F.3d at 1253. Accord United States v. Jim, No. CR 10-2653, 2012 WL 2574807, at *23 (D.N.M. June 22, 2012)(Browning, J.). Williams' bases for questioning the PSR's narrative are that it relies on hearsay and that Jane Doe 7 is a drug addict and a sex worker and so is not credible. See First Objections at 5. These remarks do not satisfy Williams' "affirmative duty to make a showing that the information in the PSR was unreliable and articulate the reasons why the facts contained therein [were] untrue or inaccurate." United States v. Rodriguez-Delma, 456 F.3d at 1253. "The fact that a defendant has objected to the ultimate conclusions drawn by the PSR . . . does not necessarily imply that a 'controverted matter' exists." United States v. Rodriguez-Delma, 456 F.3d at 1253 (citing United States v. Murray, 82 F.3d 361, 363 (10th Cir. 1996)). To the extent that Williams' objects to the narrative, the court may rely upon reliable hearsay information, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231,1245 (D.N.M. 2007)(Browning J.); U.S.S.G. § 6A1.3 (stating that a court may rely on relevant information when resolving a dispute concerning a factor important to sentencing, even if the information is not admissible at trial, "provided that the information has sufficient indicia of reliability to support its probable accuracy"). Here, the United States cites APD investigative reports and lapel camera footage that support the PSR's narrative. See First Response at 6. That footage shows that Williams was present at Baker's apartment during the incident. See First

Response at 6-7.  Accordingly, contrary to Williams' contention, the United States does not rely solely on Jane Doe 7's statements.  Moreover, to the extent that the United States relies on Jane Doe 7's statements, the fact that she struggles with drug addiction and is a sex worker does not necessarily impugn her credibility, especially as compared to Williams' contention that uncharacteristic concern for Baker's victims motivated his call to APD.  The evidence thus supports that Baker called APD and CYFD to report that Williams had abandoned her child. Williams has not demonstrated "that  a controverted matter exists."  United States v. Rodriguez-Delma, 456 F.3d at 1253.  Williams thus has not met his "affirmative duty to make a showing that the information in the PSR was unreliable and articulate the reasons why the facts contained therein [were] untrue or inaccurate."  United States v. Rodriguez-Delma, 456 F.3d at 1253.  The information is also relevant.  The PSR describes an instance of Baker punishing his victims for not following his orders, and Williams was present for at least part of the incident.  Accordingly, the Court overrules the Objection.

### J.    WILLIAMS' ASSERTION THAT HE WAS UNAWARE THAT BAKER ABUSED STANFILL IS NOT ENOUGH TO STRIKE THAT ABUSE'S DESCRIPTION FROM THE PSR.

Williams objects to the PSR's ¶¶ 48-48, at 13.  See First Objections at 5.  Those paragraphs state:

> [Jane Doe 7] stated Baker was often angry with Tob[i] Stanfill because she did not make enough money.  [Jane Doe 7] once witnessed Baker strike Stanfill in the head with a wooden chair leg.  Baker would provide methamphetamine to Stanfill, and all her earnings went to Baker.

> [Jane Doe 7] witnessed Baker physically attack [Jane Doe 4] in Denver during a commercial sex work trip.  Baker was angry with Jane Doe 4 because she refused to work when she was getting her period.  Baker struck [Jane Doe 4] seven to eight times in the legs with a wooden luggage rack and broke her leg.  This happened in early June 2016, and [Jane Doe 4] had to be treated at a hospital.  This

information corroborates prior law enforcement observation of [Jane Doe 4] with a cast on her leg during that same time.  [Jane Doe 4] was told by Chey[, another conspirator,] that Baker sold [Jane Doe 4] to [a] pimp in Phoenix for $7,000.  This corroborates [Jane Doe 4's] disappearance from the Albuquerque area in the late summer of 2017.

PSR ¶¶ 48-49, at 13.  Williams asserts that the paragraphs should be deleted, because he "was not present and did not witness any physical abuse or sexual activity between Mr. Baker and anyone else."  First Objections at 5.  Williams also contends that Jane Doe 7 said that Williams was only present when Baker was not present, and so he could not have been aware of any abuse.  See First Objections at 5.  The United States says that it is "unrealistic" that Williams was ignorant of the abuse that Jane Doe 7 suffered.  First Response at 7.  The United States asserts that Jane Doe 7 did not say that Williams was present only when Baker was absent.  See First Response at 7.

As discussed supra, Baker's abuse and the abuse's nature are relevant to Williams' "background, character, and conduct."  18 U.S.C. § 3661.  The Court sees no material difference between the abuse that the PSR's ¶¶ 48-49, at 13, discusses and the abuse that the Court has already determined is relevant.  Like the previously discussed abuse, the abuse that the PSR's ¶¶ 48-49, at 13, discusses was not some unforeseeable, isolated incident.  Instead, Baker maintained control over his victims by threats, intimidation, and violence.  Williams guarded the victims' movements when Baker was not present and so helped Baker maintain his control.  See PSR ¶ 24, at 11.  The objected-to paragraphs are also probative in that they document the abuse's extent and extremity.  Moreover, the incident discussed in the previous subsection -- in which Baker and Williams were together at Baker's apartment when APD officers and CYFD social workers investigated Baker's assertions regarding Jane Doe 7 -- demonstrates that Baker's and Williams' presence around the victims was not mutually exclusive and so Williams was not totally ignorant of Baker's abuse.

See First Response at 7.  Accordingly, Williams' assertion that he was unaware of the abuse that the PSR's ¶¶ 48-49 describes is not enough to strike those paragraphs from the PSR, and the Court overrules the Objection.

### K.   BAKER DRUGGING ANOTHER VICTIM AND TAKING HER FROM ALBUQUERQUE TO COLRADO SPRINGS IS RELEVANT, AND WILLIAMS DOES NOT ASSERT A SUFFICIENT FACTUAL OBJECTION FOR THE INCIDENT TO BE OMITTED FROM THE PSR.

Williams last objects to the PSR's ¶ 50, at 14, which states:

> In June of 2017, Baker and Williams took [Jane Doe 7], A.G., and [Jane Doe 4] to Colorado Springs, Colorado from Albuquerque for the purposes of engaging in commercial sex acts.  While staying in Colorado Springs, Baker would make trips to Albuquerque to buy narcotics, and on one occasion, he brought an African American female back with him to engage in sex work.  The female said she smoked a "blunt" with Baker in Albuquerque and then woke up in Colorado Springs (consistent with the narrative provided by Jane Doe 2).

PSR ¶ 50, at 14.  Williams says that the only evidence supporting the paragraph's assertion that Williams was in Colorado Springs in June, 2017, is "the unreliable statement of a single witness, with evidentiary credibility issues."  First Objections at 5.  Williams thus contends that "the statement does not have sufficient reliability to be included in the PSR [and] should be omitted."  First Objections at 5.  Last, Williams asserts that "the remaining statements in Paragraph 50 do not involve Williams."  First Objections at 5.  The United States responds that ¶ 50 describes conduct similar to that of which Williams was convicted.  See First Response at 8.  The United States avers that the victims that the PSR's ¶ 50, at 14, describes did not know Jane Doe 2, and so ¶ 50 corroborates Jane Doe 2's account of Baker and Williams' actions in coercing Jane Doe 2 to go with them to Colorado Springs.  See First Response at 8.

As with some of Williams' previous objections, asserting general "evidentiary credibility issues" is not enough to require the Court to "rule on the dispute or determine that a ruling is

unnecessary either because the matter will not affect sentencing, or because the court will not

consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B).  See United States v. Romero,

No. CR 09-1253 JB, 2012 WL 6632493, at *24 (D.N.M. Dec. 6, 2012)(Browning, J.)(holding that

general allegations that evidence is unreliable "do not satisfy [the defendant's] 'affirmative duty

to make a showing that the information in the PSR was unreliable and articulate the reasons why

the facts contained therein [were] untrue or inaccurate'" (quoting United States v. Rodriguez–

Delma, 456 F.3d at 1253)).   Moreover, the evidence is relevant to Williams' "background,

character, and conduct."  18 U.S.C. § 3661.  The paragraph closely parallels Williams' plea

admission -- both document Baker forcing women to leave Albuquerque to do sex work for him

in Colorado Springs.  See PSR ¶ 50, at 14; Plea Agreement ¶ 9, at 4.  The Court will consider the

information.  Based on U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v.

United States, the Court will overrule the objection.  Having resolved Williams' Objections to the

information on which the Court may rely, the Court proceeds to ruling on Williams' Objections to

the PSR's conclusions regarding sentencing enhancements and adjustments.

## II.   THE COURT GENERALLY OVERRULES WILLIAMS' OBJECTIONS TO THE SENTENCING ENHANCEMENTS, BUT WILLIAMS IS ENTITLED TO A MITIGATING-ROLE ADJUSTMENT.

The Court overrules each of Williams' objections with the exception of his mitigating-role

argument.  Specifically, the Court concludes that the PSR properly cross references § 2A3.1,

because Williams' offense involved coercion.   The Court also concludes that a 4-level

enhancement under § 2A3.1(b)(5) applies, because Williams' offense involved abducting Jane

Doe 2.  Further, § 2A3.1(b)(5)' application does not preclude § 3A1.3's enhancement for physical

restraint, and Williams aided Baker in restraining Jane Doe 2.  Last, Williams held a minor,

nonsupervisory role in Williams' enterprise, so § 3B1.2's adjustment applies.  Accordingly, the Court overrules in part and sustains in part the Second Objections.

### A.       THE USPO PROPERLY CROSS-REFERENCES U.S.S.G. § 2A3.1.

The USPO contends that U.S.S.G. § 2A3.1, rather than § 2G1.1, determines Williams' base offense level.  <u>See</u> PSR ¶ 29, at 11.  Although § 2G1.1 typically applies to 18 U.S.C. § 2422 convictions, the USPO contends that a cross reference to § 2A3.1 is appropriate, because Williams' offense involved conduct that 18 U.S.C. §§ 2241(a), (b), or 2242 describe.  <u>See</u> Addendum at 7; U.S.S.G. § 2G1.1(c)(1).  In the Second Objections, Williams asserts that the USPO errs in applying § 2A3.1, and that this error causes "an inappropriate and astronomical increase to the recommended Guideline sentencing range."  Second Objections at 3.  Williams contends that § 2G1.1, rather than § 2A3.1, applies to his offense.  <u>See</u> Second Objections at 2-3.  Williams first asserts that Jane Doe 2 is predisposed to engage in sex work, and so any coercion on Baker and Williams' part did not cause her to engage in sex work.  <u>See</u> Second Objections at 3.  Williams then contends that his offense conduct did not involve coercion, and so § 2G1.1 applies.  The Court first concludes that Jane Doe 2's predisposition, even if it exists, does not foreclose § 2A3.1's application.  The Court then concludes that Williams' offense involved coercion and threats such that § 2A3.1 properly applies.

### 1.       <u>Williams' Argument that Sex Workers Cannot be Coerced into Doing Sex Work Does Not Comport with 18 U.S.C. § 2241(a)'s Text.</u>

Williams' primary argument is that he "persuaded," but did not "threaten" or "coerce," Jane Doe 2 to get in the car with Baker and himself.  Second Objections at 3.  Williams contends that, "[i]f persuasive coercion equated 'force or threat,' the cross reference would always apply, and §2G1.1(b)(1) would be superfluous."  Second Objections at 3 (quoting 18 U.S.C. § 2241).

Instead, Williams argues that "the force or threat applied should be the cause of engagement in prostitution before the cross reference applies, particularly given the extreme increase it mandates."  Second Objections at 3 (citing United States v. Zitlalpopoca-Hernandez, 632 F. App'x 335, 337 (9th Cir. 2015)(unpublished)).  Williams asserts that, even if his offense involved threats or coercion, those threats cannot be the but-for cause of Jane Doe 2's sex work, because "Jane Doe 2 was a sex worker and would have been a sex worker with or without any alleged force or threat." Second Objections at 4.  Williams says that he "intends to present evidence that Jane Doe 2 had a long history of drug abuse, dishonesty, and criminal conduct indicative of sex work unconnected to the events of this case."  Second Objections at 4.  Williams alleges, as an example, that Jane Doe 2 has pled guilty to child abuse and has "had numerous violations of her probation for matters associated with drug use, disappearance, repeated child abuse, intimidating witnesses to her child abuse, and sexual assault towards others in her recovery program."  Second Objections at 4. According to Williams, "[t]his highlights that Jane Doe 2 was not a stranger to the streets."  Second Objections at 4.  Accordingly, Williams contends that § 2A1.3 does not apply, because Jane Doe 2 would have been a sex worker independent of his offense.  See Second Objections at 4.

The United States disagrees.  See United States' Response to Defendant Williams' Second Set of Objections to the Presentence Report at 2, filed March 23, 2020 (Doc. 201)("Second Response").  The United States says that courts "across the country have applied this cross reference in similar cases."  Second Response at 3 (citing United States v. Scott, 434 F. App'x 103, 106 (3d Cir. 2011)(unpublished); United States v. Kizer, 517 F. App'x 415, 417 (6th Cir. 2013)(unpublished)).  The United States describes Williams' arguments as "essentially asking this court to believe that although he helped Baker victimize Jane Doe 2, it is still all her fault because

she has a criminal history and was therefore a prostitute." Second Response at 4. The United States asks that the Court reject Williams' "absurd and disgusting proposition" that sex workers cannot be victimized. Second Response at 5. The United States further asserts that "Williams has not, because he cannot, point to any history of prostitution by Jane Doe 2 prior to her abduction from a bus stop by Williams and Baker." Second Response at 4. The United States asserts that Williams assisted Baker in forcing Jane Doe 2 to engage in a sex act, the cross reference is proper. See Second Response at 5.

Williams pled guilty to violating 18 U.S.C. § 2422(a). See Plea Agreement ¶ 8, at 3. Section 2G1.1 pertains to "promoting prostitution or prohibited sexual conduct," and applies to § 2422(a). Section 2A3.1 pertains to "criminal sexual abuse," and applies to violations of 18 U.S.C. §§ 2241 and 2242. See U.S.S.G. § 2A3.1. The cross reference at § 2G1.1(c)(1) directs courts to apply § 2A3.1, "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242." U.S.S.G. § 2G1.1(c)(1). The application note to § 2G1.1 summarizes such offenses:

(A)     Conduct Described in 18 U.S.C. § 2241(a) or (b).  -- For purposes of subsection (c)(1), conduct described in 18 U.S.C. § 2241(a) or (b) is: (i) using force against the victim; (ii) threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping; (iii) rendering the victim unconscious; or (iv) administering by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance and thereby substantially impairing the ability of the victim to appraise or control conduct.  This provision would apply, for example, if any dangerous weapon was used or brandished, or in a case in which the ability of the victim to appraise or control conduct was substantially impaired by drugs or alcohol.

(B)     Conduct Described in 18 U.S.C. § 2242.  -- For purposes of subsection (c)(1), conduct described in 18 U.S.C. § 2242 is: (i) engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping); or

(ii) engaging in, or causing another person to engage in a sexual act with a victim who is incapable of appraising the nature of the conduct or who is physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act.

U.S.S.G. § 2G1.1 n.4.

The Court does not agree with Williams' argument that he could not have coerced Jane Doe 2 into sex work, because she would have done sex work in any event.  First, Williams points to no evidence that Jane Doe 2 did sex work before meeting Baker, and the United States asserts that she had not engaged in such work.  See Second Response at 4.  Williams' argument is thus that she had a propensity to do sex work.  See Second Objections at 3 (asserting that Jane Doe 2's criminal history is "indicative of sex work").  To support this argument, Williams asserts that, before meeting Baker, Jane Doe 2 had pled guilty to child abuse and "had numerous violations of her probation for matters associated with drug use, disappearance, repeated child abuse, intimidating witnesses to her child abuse, and sexual assault towards others in her recovery program."  Second Objections at 3.  None of these alleged violations is "indicative of sex work," Second Objections at 3, or even correlated with sex work.  Accordingly, Williams has presented no evidence that Jane Doe 2 would have engaged in sex work regardless of Baker and Williams' actions in this case.

Second, even aside from these factual shortcomings, the logical premise is flawed.  By Williams' logic, his conviction could not stand: if one cannot threaten Jane Doe 7 to do what she would have inevitably done, there is no reason he could persuade such inevitable action.  Under Williams' logic, no sex worker could ever fall victim to the litany of sex offenses that the United States Code provides, including rape, where the sex worker may have engaged in some other sex act of his or her own free will.  Williams affords no justification for the sweeping argument that

Congress excluded all sex workers from its statutes' protection.  See, e.g., Bostock v. Clayton Cty., Georgia, No. 17-1618, 2020 WL 3146686, at *11 (U.S. June 15, 2020)(Gorsuch, J.)("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.")

There is nothing in §§ 2422, 2241, and 2242's text that suggests that sex workers cannot be victims of acts that otherwise violate those statutes.  The United States Court of Appeals for the District of Columbia Circuit, interpreting § 2422(b)'s similar language in United States v. Hite, 769 F.3d 1154 (D.C. Cir. 2014), discussed the statutes operative terms:

> The ordinary meanings of the verbs persuade, induce, entice, and coerce demonstrate that § 2422(b) is intended to prohibit acts that seek to transform or overcome the will of a minor.  For instance, "persuade" is commonly defined as "[t]o induce or win over (a person) to an act or course of action; to draw the will of (another) to something, by inclining his judgement [sic ] or desire to it; to prevail upon, to urge successfully, to do something," Oxford English Dictionary (2d ed.1989), or "to win over by an appeal to one's reason and feelings, as into doing or believing something," Black's Law Dictionary (6th ed.1990).  See also Webster's Third New International Dictionary, Unabridged (1981) (defining "persuade" as "to induce by argument, entreaty, or expostulation into some mental position . . . win over by an appeal to one's reason and feelings (as into doing or believing something)").  Likewise, "induce" is ordinarily defined as "[t]o lead (a person), by persuasion or some influence or motive that acts upon the will," "to lead on, move, influence, prevail upon (any one) to do something." Oxford English Dictionary (2d ed.1989) (emphasis in original).  See also Black's Law Dictionary (6th ed.1990) ("induce" defined as "[t]o bring on or about, to affect, cause to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on"); Webster's Third New International Dictionary, Unabridged (1981) ("induce" defined as "to move and lead (as by persuasion or influence)," "prevail upon," and "to bring on or bring about").  "Entice" and "coerce" similarly connote efforts to affect the mind or will of another.  See, e.g., Black's Law Dictionary (6th ed.1990) ( "entice" means "to lure, induce, tempt, incite, or persuade a person to do a thing"; "coerce" means "[c]ompelled to compliance; constrained to obedience, or submission in a vigorous or forcible manner").  Congress is presumed to use words in the common, ordinary meaning absent contrary indication, and we find none here.  See, e.g., FDIC v. Meyer, 510 U.S. 471, 476 (1994); Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 252 (2004).

United States v. Hite, 769 F.3d at 1161.  Each of these terms refers to specific instances of pressure, and which which general propensity does not necessarily negate.  The terms instead require overcoming or transforming the victim's will as to a specific course of action.  See United States v. Tee, 881 F.3d 1258, 1264 (10th Cir. 2018)(affirming § 2422(a) conviction even though the victim first proposed the idea of prostitution); United States v. Hite, 769 F.3d at 1161.  Williams' argument substitutes the general for the specific to assert that, if Jane Doe 2 had a general propensity to engage in sex work, she could not be criminally persuaded or coerced into doing any specific sex acts.  But this argument makes no more sense than saying that prison guards cannot force-feed inmates, because those inmates would have eaten at some other point in their lives, or that Person A's intent to have sex with Person B on Friday means that Person B is not liable if he rapes Person A on Saturday.  Cf. United States v. Tee, 881 F.3d 1258, 1264 (10th Cir. 2018)(affirming a § 2422(a) conviction even though the victim first presented the idea of traveling in interstate commerce to commit a commercial sex act).

For similar reasons, prior sex work is typically not admissible to disprove later coercion. See, e.g., Fed. R. Evid. 412; United States v. Pablo, 696 F.3d 1280, 1299 (10th Cir. 2012)(affirming the district court's exclusion of evidence, in a rape prosecution, that the victim had consensual sex with two other men on the night of the rape); Jones v. Goodwin, 982 F.2d 464, 471 (11th Cir. 1993)("[A] woman's consensual sexual activities with certain individuals in no way imply consent to similar activities with others."); United States v. Saunders, 943 F.2d 388, 392 (4th Cir. 1991)("[I]t is intolerable to suggest that because the victim is a prostitute, she automatically is assumed to have consented with anyone at any time.").  Accordingly, that Jane Doe 2 may later have engaged in sex work independent of Baker does not foreclose § 2A3.1's application.

**2.      The PSR Properly Cross References § 2A3.1 in Determining Williams' base offense level.**

Williams argues that he only persuaded Jane Doe 2 and that, moreover, if any coercion occurred, it resulted from Baker's conduct and not his.  See Second Objections at 4.  The United States contends that § 2A3.1 applies, because Williams' offense conduct involved "forcing, threatening, and coercing" Jane Doe to do sex work.  Second Response at 5.  The Court concludes that the cross reference is proper under either §§ 2241 or 2242.

First, the cross reference applies under § 2241, because Williams' offense conduct involved: "(i) using force against the victim; and (ii) threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping."  U.S.S.G. § 2G1.1 n.4.  Williams' offense involved Baker brandishing a firearm to intimidate Jane Doe 2 into getting into a car with Baker and Williams.  See PSR ¶ 14, at 9 ("Baker told [Jane Doe 2] to get in the vehicle and flashed a handgun he had in his waistband.").  Baker told Jane Doe 2 that "she had 'no choice' but to get in the vehicle."  PSR ¶ 14, at 9.  In the Plea Agreement, Williams admits that he and Baker "made clear that she was to get into the vehicle."  Plea Agreement ¶ 9, at 4.  The Guidelines application note to § 2G1.1(c)(1) provides that the cross reference "would apply, for example, if any dangerous weapon was used or brandished[.]"  U.S.S.G. § 2G1.1 note 4.  The cross reference is thus appropriate, because Williams offense involved conduct that § 2241(a) describes.  See 18 U.S.C. § 2241(a) ("Whoever . . . knowingly causes another person to engage in a sexual act -- [] by using force against that other person; or [] by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping[.]").

The cross reference is also appropriate under § 2242.  A cross reference is permissible under that section if the offense involved "engaging in, or causing another person to engage in, a

sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)." U.S.S.G. § 2G1.1 n.4. The threats continued once Jane Doe 2 was held in Colorado Springs, where Baker assaulted and raped Jane Doe 2 when she refused to work or to forfeit her earnings to Baker. See PSR ¶ 17, at 9. Williams assisted these threats by guarding Jane Doe 2 when Baker was not around, thus preventing her escape and maintaining Jane Doe 2's fear of Baker. "The definition of 'fear,' as used in 18 U.S.C. § 2242(1), is very broad." United States v. Castillo, 140 F.3d 874, 885 (10th Cir. 1998)(citing United States v. Gavin, 959 F.2d 788, 791 (9th Cir. 1992)). "The element is satisfied when the defendant's actions implicitly place the victim in fear of some bodily harm." United States v. Castillo, 140 F.3d at 885 (citing United States v. Cherry, 938 F.2d 748, 755 (7th Cir. 1991)). In United States v. Monsalve, 342 F. App'x 451 (11th Cir. 2001)(unpublished), the United States Court of Appeals, citing United States v. Castillo, upheld a cross reference where the defendant smuggled two women into the United States with the promise that they would be waitresses. See United States v. Monsalve, 342 F. App'x at 454. After arriving in the United States illegally, "they were told they owed [the defendant] a $16,000 smuggling fee and that they must repay him by working as prostitutes. They had their identification documents taken from them, spoke no English, and depended on Monsalve and his associates for food, water, shelter, and clothing." 342 F. App'x at 454. One of the defendant's "managers" told the victims that he would have them deported if they tried to escape. 342 F. App'x at 454. Here, Baker and Williams took Jane Doe 2, against her will, to an unfamiliar city. See PSR ¶ 14, at 9. They refused to stop on the drive to Colorado Springs when she asked to use a restroom or get some food. See PSR ¶ 14, at 9. They took all her money such that she was

completely dependent upon Baker for food, water, and shelter.  See PSR ¶ 17, at 9.  In three instances, Baker gave Jane Doe 2 methamphetamine, "which she used to stay awake because she was afraid of being raped by Baker."  PSR ¶ 17, at 9.  As discussed supra, Williams assisted in this conduct such that it is properly applied to his offense.  Williams' offense conduct thus involved placing Jane Doe 2 in fear, and this fear caused Jane Doe 2 to engage in sex work.  Accordingly, Williams' offense involved conduct that §§ 2242(1) and 2242 describe, and the cross reference is appropriate.  The Court thus overrules the Objection and concludes that § 2A3.1 determines Williams' base offense level.

### B.  A 4-LEVEL ENHANCEMENT FOR ABDUCTION APPLIES.

Williams next asserts that §2A3.1(b)(5), which provides a 4-level enhancement for offenses involving abduction, does not apply to his Guidelines offense level.  See Second Objections at 4.  Williams asserts that Jane Doe 2 "was persuaded, not forced, to accompany defendants," and that she "participated in an activity which was not unusual for her."  Second Objections at 5.  Last, Williams maintains that "there was no[] force involved and an abduction did not occur."  Second Objections at 5.  The United States disagrees and asserts that the enhancement applies, because Baker showed Jane Doe 2 a gun and made it clear that she had no choice but to accompany them to a different location.  See Second Response at 6.

Section 2A3.1(b)(5) provides a 4-level enhancement "[i]f the victim was abducted." U.S.S.G. § 2A3.1(b)(5).  "Abducted" means that a victim was forced to accompany an offender to a different location. U.S.S.G. § 1B1.1, n.1(A) ("'Abducted' means that a victim was forced to accompany an offender to a different location.  For example, a  bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction.").  See United States v. Kavo,

128 F. App'x 447, 451-52 (6th Cir. 2005)(holding that abduction occurred within the meaning of § 2A3.1(b)(5) when the defendant physically carried the victim against her wishes from the main floor of his home to his basement bedroom, because it gave the defendant a better chance to complete his crime than "if he had remained in the immediate area where his sister was sleeping and could have been summoned to assist the victim"); United States v. Mix, 77 F. App'x 986, 990 (9th Cir. 2003)(upholding district court's enhancement for abduction when the defendant "forced his victim at knifepoint into a back room to continue the assault").   The defendant need not, however, use violent force: "'[T]he abduction adjustment requires only that force necessary to overcome the particular victim's will.'"  United States v. Martinez-Hernandez, 593 F.3d 761, 762 (8th Cir. 2010)(quoting United States v. Saknikent, 30 F.3d 1012, 1014 (8th Cir. 1994))(alteration added in United States v. Martinez-Hernandez).  See United States v. Hefferon, 314 F.3d 211, 226-27 (5th Cir. 2002)(concluding that abduction happened by "veiled coercion" where the defendant "was able to isolate the victim by dominating her lack of intellectual ability, and also by appealing to the credulous nature of a seven-year-old").

These cases show that the abduction enhancement applies when the offense involves conduct that overcomes the victim's will to move the victim to a different location.  Here, Baker and Williams abducted Jane Doe 2.  Baker flashed a gun, and he and Williams "made clear that she was to get in [their] vehicle."  Plea Agreement ¶ 9, at 4.  See PSR ¶ 14, at 9 (providing that Baker told Jane Doe 2 that she "had no choice" but to get into the car).  Contrary to Williams' assertion, Jane Doe 2 thus did not get in the car solely of her volition but rather because Baker and Williams overcame Jane Doe 2's will.  See United States v. Martinez-Hernandez, 593 F.3d at 762 ("[T]he abduction adjustment requires only that force necessary to overcome the particular

victim's will." (internal quotation marks omitted)).  Further, although Williams contends that Jane

Doe 2 willingly got into the car, he makes no suggestion that Jane Doe 2 did so willing to leave

Albuquerque for Colorado Springs.  To the contrary, during the drive to Colorado Springs, Baker

refused to stop for food or let Jane Doe 2 use the restroom, further demonstrating that she was not

a willing participant in the ride.  See PSR ¶ 16, at 9.  Accordingly, the Court overrules the

Objection, and § 2A3.1(b)(5)'s 4-level enhancement applies.

### C.   A 2-LEVEL ENHANCEMENT FOR PHSYICAL RESTRAINT IS APPROPRIATE.

Williams next objects to the PSR's application of a 2-level enhancement under U.S.S.G.

§3A1.3, which applies to offenses involving physical restraint.  See Second Objections at 5.

Williams contends that § 3A1.3, "requires *forcible* restraint," like "'being tied, bound, or locked

up.'"  Second Objections at 5 (emphasis in Second Objections)(quoting  U.S.S.G §1B1.11 n.1(L)).

He says that the restraint that § 3A1.3 requires "is not the same as being put in a hotel room,

particularly in a situation where other witnesses have verified the women were free to come-and-

go as they pleased."  Second Objections at 5.  Finally, Williams contends that, if the Court

concludes that § 2A3.1(b)(5)'s abduction-enhancement applies, applying § 3A1.3 would amount

to impermissible double counting.  See Second Objections at 5 (citing U.S.S.G. §3A1.3 n.2).  The

United States responds that § 3A1.3 applies when the defendant "hold[s] the victim back from

some action, procedure, or course, prevent[s] the victim from doing something, or otherwise

keep[s] the victim within bounds or under control."  Second Response at 6 (citing United States v.

Checora, 175 F.3d 782, 790 (10th Cir. 1999)).  The United States contends that Baker's abuse

amounts to a physical restraint and that Williams is responsible for that restraint.  See Second

Response at 7-8.  The United States thus asks that the Court overrule the Objection.

Section 3A1.3 provides a 2-level enhancement if the offense involved physically restraining the victim.  See U.S.S.G. § 3A1.3.  Application note 1(L) of the Commentary to Guideline § 1B1.1 states that the term "physically restrained" means "the forcible restraint of the victim such as being tied, bound, or locked up."  U.S.S.G. § 1B1.1 n.1(L).  "By use of the words 'such as,' the Sentencing Commission listed 'being tied, bound, or locked up'" by way of example rather than limitation."  United States v. Nelson, 740 F. Supp. 1502, 1512 (D. Kan. 1990)(O'Connor, C.J.)(quoting U.S.S.G. § 1B1.1 cmt. and citing United States v. Stokley, 881 F.2d 114, 116 (4th Cir. 1989).  See United States v. Joe, 696 F.3d 1066, 1071 (10th Cir. 2012)("Like most other courts, we have held that the examples listed in the definition are intended only as examples and not as an exhaustive list of how a victim may be physically restrained.").  Accordingly, there does not have to be "physical touching of the victim," because "[k]eeping someone from doing something is inherent within the concept of restraint."  United States v. Fisher, 132 F.3d 1327, 1329-30 (10th Cir. 1997)(applying § 3A1.3 where a "coconspirator deliberately kept the security guard at bay by pointing a gun directly at his head").  Last, the restraint of the victim need not occur during the offense of conviction, as long as the restraining occurred as part of the relevant conduct.  See United States v. Holbert, 285 F.3d 1257, 1262-63 (10th Cir. 2002)("We hold that, for the purpose of applying § 3A1.3, the defendant must have physically restrained a victim in the course of the offense, and that the course of the offense includes any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).").

While some courts have limited their interpretation of physical restraint to instances similar to § 1B1.1 n.1(L)'s examples, see, e.g., United States v. Anglin, 169 F.3d 154, 164 (2d Cir. 1999), the tenth Circuit "has taken a different approach" and interprets physical restraint expansively,

United States v. Joe, 696 F.3d at 1071.  In United States v. Miera, 539 F.3d 1232 (10th Cir. 2008), the Tenth Circuit concluded that a physical-restraint enhancement was proper when the defendants, during a bank robbery, ordered the bank's employees and patrons to put their hands up and not move.  See 539 F.3d at 1234.  The Tenth Circuit noted that "physical restraint is not limited to physical touching of the victim."  539 F.3d at 1234.  Accordingly, that Williams may not have personally used the means that § 1B1.1 n.1(L) describes does not foreclose § 3A1.3's application.  In United States v. Joe, a Tenth Circuit panel noted, with disapproval, the breadth of the Tenth Circuit's interpretation of physical restraint:

> Thus, although the Guidelines provision we are examining here uses the term "physically restrained," and "physically" would seem to be a modifier of "restrained," our cases have wrenched "physically" from its original place so that it now seems to describe the conduct or the inner thoughts of the victim.  Thus, we have said that keeping victims from "even considering an escape" is to physically restrain them.  [United States v. ]Miera, 539 F.3d at 1235.  Indeed, it may seem as though our construction has gone so far as to render "physically" a nullity: if preventing a victim from thinking about escape, see id., is to "physically restrain" that victim, then it is quite a challenge to conceive of a restraint that would not be deemed "physical" under this court's case law.

United States v. Joe, 696 F.3d at 1072.  The Tenth Circuit panel concluded, however, that the Tenth Circuit caselaw expansively interpreting physical restraint bound the panel.  See 696 F.3d at 1071.

Williams' offense conduct involves physical restraint.  Although Williams avers that Jane Doe 2 was "free to come and go," he points only to "interview[s with] workers at other hotels in the Albuquerque area," and not to any evidence specific to the hotel in Colorado Springs where Baker held Jane Doe 2.  First Objections at 3.  See Second Objections at 5.  Moreover, Baker abused Jane Doe 2 when she did not comply with his demands that she engage in sex work or forfeit her earnings.  See PSR ¶ 17, at 9.  Williams then guarded Jane Doe 2's hotel room in

Colorado Springs, further restraining her.  Finally, even if Williams was not preventing Jane Doe 2's escape by guarding her hotel room, she was in an unfamiliar city without money.  Given the Tenth Circuit's broad interpretation of § 3A1.3, this all amounted to physically restraining Jane Doe 2.  See United States v. Miera, 539 F.3d at 1234.

Williams asserts that, if the Court applies the abduction enhancement, application of the physical-restraint enhancement amounts to impermissible double counting.  See Second Objections at 5.  The United States responds that, because there was additional conduct beyond the initial abduction that amounts to physical restraint, applying both enhancements is permissible.  See Second Response at 7.  The Tenth Circuit has stated that, while generally "impermissible 'double counting' occurs 'when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes,'" sometimes "the Guidelines themselves provide an alternative principle of double counting."  United States v. Joe, 696 F.3d at 1070 (quoting United States v. Reyes Pena, 216 F.3d 1204, 1209 (10th Cir. 2000)).  Where the "particular guideline specifically speaks to double counting, such an instruction would be controlling" over the general double-counting analysis.  United States v. Coldren, 359 F.3d 1253, 1256 (10th Cir. 2004).  U.S.S.G. § 3A1.3, the restraint-of-victim enhancement, instructs courts not to "apply this adjustment where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself (e.g. this adjustment does not apply to offenses covered by § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint))."  U.S.S.G. § 3A1.3 n.2.

In United States v. Strong, 826 F.3d 1109 (8th Cir. 2016), the United States Court of Appeals for the Eighth Circuit addressed an objection similar to Williams' objection. See 826 F.3d at 1116. The defendant relied upon § 3A1.3's Application Note 2, which refers specifically to abduction, to argue that a physical-restraint enhancement and an abduction enhancement are mutually exclusive. See 826 F.3d at 1117. The Eighth Circuit disagreed with the defendant and held, first, that the two enhancements are not necessarily mutually exclusive: "'the [Guidelines] drafters did not intend that [abduction and physical restraint enhancements] be considered mutually exclusive, but rather gradations of aggravating conduct.'" 826 F.3d at 1117 (quoting United States v. Gall, 116 F.3d 228, 230 (7th Cir. 1997), and citing United States v. Smith, 320 F.3d 647, 657-58 (6th Cir. 2003)). The Eighth Circuit further asserted that both enhancements applied, because the defendant was conviction of aggravated sexual abuse, rather than abduction, and the Eighth Circuit acknowledged that, "[h]ad the offense been abduction, adding a physical restraint adjustment would have clearly been improper based on § 3A1.3, cmt. n.2." 826 F.3d at 1117. The Eighth Circuit then concluded that the enhancements were not based on the same conduct -- the abduction enhancement applied, because the defendant dragged the victim from her neighbor's house to her house, and the restraint enhancement applied, because the defendant kept the victim at her house, against her will, for three days. See 826 F.3d at 1117.

Here, application of both enhancements does not amount to double counting, because both enhancements are based on separate conduct. The abduction enhancement applies, because Williams' offense conduct involved overcoming Jane Doe 2's resistance or will to transport her to another location. See PSR ¶ 14, at 9. The physical restraint enhancement applies, because Williams' offense conduct involved keeping her in the Colorado Springs hotel room against her

will.  See PSR ¶ 17, at 9.  Further, the physical restraint that supports the § 3A1.3 enhancement is not an element of Williams' conviction.  Williams pled guilty to violating 18 U.S.C. § 2422(a).  See Plea Agreement ¶ 9, at 4.  In the Plea Agreement, Williams admits that he "knowingly persuaded, induced, enticed, or coerced" Jane Doe 2 "to travel in interstate commerce" "to engage in prostitution."  Plea Agreement ¶ 8, at 3-4.  The physical restraint that supports the enhancement occurred after the abduction, while Williams aided Baker in keeping Jane Doe 2 in the Colorado Springs hotel room.  Williams' offense, therefore, is not one that § 2A4.1 covers, and so applying both § 3A3.1 and § 2A3.1(b)(5) does not amount to impermissible double counting.  Accordingly, the Court overrules the Objection.

### D.    WILLIAMS IS ENTITLED TO A MITIGATING ROLE ADJUSTMENT.

The USPO concludes that Williams is not entitled to a mitigating-role adjustment, largely because Williams was "present" during several of Baker's offenses.  Addendum at 8.  Specifically, the USPO asserts that an adjustment under U.S.S.G. § 3B1.2 is improper, because: (i) "Williams was present during his sex trafficking activities over a period of time"; (ii) "Williams is known to be present during the offense of conviction (Count 6) which occurred between June and September 2016"; (iii) Williams was also present during the incident involving [Jane Doe 7] and her missing child in January 2017"; (iv) Jane Doe 7 "has also alleged that Williams was present with Baker in June 2017 during a trip to Colorado"; and (v) Jane Doe 7 "also alleged that Williams often guarded the victims' movements when Baker was not present, which corroborates [Jane Doe 2's] statement."  Addendum at 5.  Williams avers that he is "substantially less culpable than anyone else in the group," and that, if Baker's criminal activity "stretched to many states beyond New Mexico and Colorado, it is clear Mr. Williams did not understand the scope and structure."  Second

Objections at 5.   Williams argues that he did not have decision-making authority and "did not participate in any planning."   Second Objections at 5.   Last, Williams contends that "he did not benefit," and that no one "gave him compensation."   Second Objections at 6.   Williams characterizes himself as "along for the ride and a temporary stand-in," so he was the "quintessential minimal participant."   Second Objections at 6.   The United States agrees with Williams.   See Second Response at 8.   The United States says that, although Williams aided and abetted Baker's offenses, the United States has no evidence "of how Williams benefitted financially from these crimes, if at all," and that only Baker made the decisions and "doled out the abuse on the victims." Second Response at 8.   The United States thus "agrees that application of a departure for a mitigating role is likely appropriate."   Second Response at 8.

The Guidelines define a minor participant as one "who is less culpable than most other participants in the criminal activity."   U.S.S.G. § 3B1.2 n.5.   A defendant "who performs a limited function in the criminal activity may receive an adjustment under this guideline."   U.S.S.G. § 3B1.2 n.3(A).   In determining whether Williams was a minor participant in the murders, the Court may consider: (i) "the degree to which the defendant understood the scope and structure of the criminal activity"; (ii) "the degree to which the defendant participated in planning or organizing the criminal activity"; (iii) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (iv) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and (v) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2 n.3(C).

A 2-level adjustment under § 3B1.2(b) is proper.  Williams conduct can be accurately described as "limited" or as "substantially less culpable than [an] average participant" in Baker's crimes.  U.S.S.G. § 3B1.2 n.3(A) (title case omitted).  First, as the United States notes, Williams received little by way of financial gain in a criminal enterprise that was, primarily, about financial gain.  See Second Response at 8.  Second, Williams was not a decision-maker in the enterprise, but rather took orders from Baker.  See Second Response at 8.  Williams thus did "not have a proprietary interest in the criminal activity and [was] simply being paid to perform certain tasks." U.S.S.G. § 3B1.2 n.3(C).  Moreover, these is no evidence that Williams himself engaged in any direct abuse of the victims.  See PSR ¶¶ 14-17, at 9; id. ¶¶ 45-47, at 13.  Williams was thus a "minor participant" in Baker's crimes.  U.S.S.G. § 3B1.2(b).

That Williams is entitled to a mitigating-role adjustment is not, however, an easy call.  As discussed in Section I, supra, Williams' relevant conduct includes several of Baker's heinous actions.  As the USPO notes, Williams was present for some of those acts, and, as the Court notes in Section I, supra, a preponderance of the evidence does not establish that he was completely ignorant of Baker's abuse.  Further, Jane Doe 7 describes Williams as Baker's "pimp partner." PSR ¶ 45, at 13.  Accordingly, Williams cannot accurately be described as a "minimal participant" in Baker's enterprise.  U.S.S.G. § 3B1.2(a).  Moreover, the Application Notes to § 3B1.2 provide that, when a defendant receives a lower offense level "by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct," a role adjustment "ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense."  U.S.S.G. § 3B1.2 n.3(B). Williams was convicted of violating § 2422(a) despite being responsible for conduct that

constitutes more serious offenses. Nonetheless, that culpability is reflected in the cross reference to § 2A3.1, and so Williams has not received a lower offense level "by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct." U.S.S.G. § 3B1.2 n.3(B). Williams is thus "less culpable than most other participants in the criminal activity," but his role cannot "be described as minimal." U.S.S.G. § 3B1.2 n.5. Accordingly, a 2-level adjustment is proper, and the Court sustains in part and overrules in part the Objection.

### III. THE 4-LEVEL ENHANCEMENT UNDER § 2A3.1(b)(1) APPLIES AND DOES NOT CONSTITUTE IMPERMISSIBLE DOUBLE COUNTING, BUT THE 2-LEVEL ENHANCEMENT UNDER § 2A3.1(b)(4) DOES NOT APPLY.

Last, the Court resolves two issues with the PSR that the parties do not raise. First, the PSR, after concluding that a cross reference to § 2A3.1 applies, adds a 4-level enhancement under § 2A3.1(b)(1), because Williams' offense involves conduct that §§ 2241 or § 2242 describes. See PSR ¶ 30, at 11. The Court concludes that, in this case, applying § 2A3.1(b)(1) does not impermissibly double count conduct that formed the basis for the cross reference under § 2G1.1(c)(1). Second, the PSR applies a 2-level enhancement for seriously bodily injury. See PSR ¶ 31, at 11. The Court concludes that there is insufficient evidence that Jane Doe 2 suffered serious bodily injury, and so the 2-level enhancement under § 2A3.1(b)(4) does not apply.

#### A. A 2-LEVEL ENHANCEMENT FOR SERIOUS BODILY INJURY DOES NOT APPLY.

The PSR calculates a 2-level enhancement under § 2A3.1(b)(4). See PSR ¶ 31, at 11. Although neither party objects to this enhancement, the Court concludes that the enhancement does not apply to Williams' offense. Section 2A3.1(b)(4)(B) directs courts to apply a 2-level enhancement "if the victim sustained serious bodily injury." U.S.S.G. § 2A3.1(b)(4)(B). The Guidelines provide two definitions of "serious bodily injury. U.S.S.G. § 1B1.1 note 1(L). First,

"'[s]erious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or [ii] requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 note 1(L). Second, "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or [§] 2242 or any similar offense under state law." U.S.S.G. § 1B1.1 note 1(L). The second definition cannot apply, however, "when the sentencing court is calculating the offense level for an 18 U.S.C. § 2241 offense." United States v. Jim, 786 F.3d 802, 814 (10th Cir. 2015). This limitation is because § 2A3.1's application note 1 states that, "for the purposes of this guideline, 'serious bodily injury' means conduct other than criminal sexual abuse, which is already taken into account in the base offense level under subsection (a)." U.S.S.G. § 2A3.1 n.1 (emphasis in original). The Tenth Circuit has held that "the two-level serious-bodily-injury enhancement can still apply to a sexual abuse offender, but it must be based on the fact that the victim's injuries meet" the first definition -- that is, "'injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.'" United States v. Jim, 786 F.3d at 814 (quoting U.S.S.G. § 1B1.1 n.1(L)). Consequently, the Tenth Circuit holds that, when § 2A3.1 provides the base offense level,

> a sentencing court can consider injuries the victim suffered resulting directly from the sexual abuse as well as those suffered during relevant conduct surrounding that offense when determining whether the victim suffered serious bodily injury, defined as injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation[.]

United States v. Jim, 786 F.3d at 815 (citation omitted).  See United States v. Volpe, 224 F.3d 72, 78 (2d Cir. 2000)(noting that § 2A3.1(b)(4)'s "degree-of-injury adjustment punishes the assailant for the injuries to the victim *that result from the assault*")(emphasis in original).

Here, § 2A3.1 provides Williams' base offense level, so § 2A3.1(b)(4)'s 2-level enhancement can apply only if his offense conduct causes "extreme physical pain or the protracted impairment of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1 n.1(L).  There is no such evidence here that Jane Doe 2 sustained such an injury.  Accordingly, the Court directs that the PSR's ¶ 31, at 11, be amended to omit the 2-level enhancement for serious bodily injury.

## B.   A 4-LEVEL ENHANCEMENT UNDER § 2A3.1(b)(1) IS APPROPRIATE AND DOES NOT CONSTITUTE DOUBLE COUNTING.

After concluding that a cross reference to § 2A3.1, pursuant to § 2G1.1, is appropriate, the PSR applies a 4-level enhancement under § 2A3.1(b)(1).  That section applies if the defendant's relevant offense conduct involves conduct that §§ 2241(a) or (b) describe.  See U.S.S.G. § 2A3.1(b)(1).  Neither party objects to this enhancement.

Courts have uniformly held that cross-referencing to § 2A3.1, because the offense involved conduct that § 2241 describes, does not foreclose a 4-level enhancement under § 2A3.1(b)(1).  In United States v. Flanders, 752 F.3d 1317 (11th Cir. 2014), the Eleventh Circuit concluded that "the Sentencing Commission intended for the entirety of § 2A3.1, including any enhancements, to apply following the application of the cross reference."  United States v. Flanders, 752 F.3d at 1340 (citing U.S.S.G. § 1B1.5(a)).  The Eleventh Circuit further concluded that § 2G1.1(c)(1)'s cross reference and § 2A3.1(b)(1)'s enhancement involve different conduct.  See 753 F.3d at 1340.  The Eleventh Circuit said that the cross reference applies to offenses that involve sexual abuse, while

the enhancement applies "only where the offense involved conduct constituting the more severe subset of aggravated sexual abuse offenses."  753 F.3d at 1340 (citing U.S.S.G. §§ 2A3.1(b)(1), 1G1.1(c)(1); 18 U.S.C. § 2241(a) and (b)).  The Eleventh Circuit thus held that, even to the extent that the defendant's base offense level and the § 2A3.1(b)(1) enhancement were "based on the same conduct, . . . those calculations did not constitute impermissible double counting."  753 F.3d at 1340. (citing United States v. Webb, 665 F.3d 1380, 1382-83 (11th Cir. 2012).  The United States Court of Appeals for the Ninth Circuit takes a similar approach applying § 2A3.2(c)(1)'s cross reference, which the Ninth Circuit noted "applies if the offense involved a violation of either 18 U.S.C. §§ 2241 or 2242," neither of which require the use of force.  United States v. Archdale, 229 F.3d 861, 869 (9th Cir. 2000).  The Ninth Circuit thus concluded that, because it is possible to be sentenced under § 2A3.1 for an offense that does not involve the use of force, such behavior may justify an enhancement, because "the guideline's base offense level will not necessarily have been set to capture the full extent of the wrongfulness of such behavior."  United States v. Archdale, 229 F.3d at 869 (internal quotation marks omitted).  Moreover, the Ninth Circuit noted that, because "'[t]he Sentencing Commission plainly understands the concept of double counting and expressly forbids it where it is not intended,'" it is notable that the Sentencing Commission did not preclude the enhancement's application following a cross reference. United States v. Archdale, 229 F.3d at 869 (quoting United States v. Williams, 954 F.2d 204, 208 (4th Cir. 1992)). The Tenth Circuit has similarly held that, "in a case involving the sexual abuse of a child, the guidelines provide the sentencing judge with the flexibility to apply a force enhancement depending on the facts."  United States v. Reyes Pena, 216 F.3d at 1210-11.  Accordingly, it is

permissible to apply § 2A3.1(b)(1)'s 4-level enhancement, because Williams' offense conduct involved the use of force that § 2241(a) and (b) describes.

In summary, under § 2A3.1, Williams' base offense level is 30. See U.S.S.G. § 2A3.1(a)(2). A 4-level enhancement under U.S.S.G. § 2A3.1(b)(1) is proper, because Williams' offense involves conduct that § 2241(a) and (b) describe. See PSR ¶ 30, at 11. A 4-level enhancement for abduction under U.S.S.G. § 2A3.1(b)(5), and a 2-level enhancement for physical restraint under U.S.S.G. § 3A1.3 are proper, but Williams is also entitled to a 2-level adjustment under U.S.S.G. § 3B1.2. Williams is further entitled to a 3-level adjustment for his acceptance of responsibility and assistance to authorities. See PSR ¶¶ 38-39, at 13. Williams cumulative offense level is thus 35. Williams has a criminal history score of zero, and so his resulting criminal history category is 1. See PSR ¶ 62, at 17. Accordingly, Williams' Guidelines imprisonment range is 168-210 months imprisonment. See U.S.S.G. §5A.1. The Court notes, however, that Williams and the United States agree that a sentence of thirty to sixty months imprisonment is appropriate. See Plea Agreement ¶ 15, at 6. The Court will determine Williams sentence at his sentencing hearing.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Letitia Carroll Simms
  Assistant U.S. Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Paul M. Linnenburger
Rothstein Donatelli, LLP
Albuquerque, New Mexico

*Attorneys for the Defendant*